No. 02-243

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 335

STATE OF MONTANA,

Plaintiff and Respondent,

v.

JOHN M. FISHER,

Defendant and Appellant.

APPEAL FROM:     District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Russell C. Fagg, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Gary E. Wilcox, Attorney at Law, Billings, Montana

For Respondent:

Hon. Mike McGrath, Attorney General; C. Mark Fowler,
Assistant Attorney General, Helena, Montana

Dennis Paxinos, Yellowstone County Attorney, Billings, Montana

Submitted on Briefs: September 5, 2002

Decided:  December 20, 2002

Filed:

_____
Clerk

Justice Terry N. Trieweiler delivered the Opinion of the Court.

¶1    Defendant John Fisher was charged with possession of dangerous drugs and drug paraphernalia in the District Court for the Thirteenth Judicial District in Yellowstone County.  Fisher pled guilty to the charge and reserved the right to appeal the District Court's order that denied Fisher's motion to suppress evidence.  The District Court gave Fisher a three year suspended sentence and a $500 fine.  Fisher appeals the District Court's order denying his motion to suppress evidence.  We reverse the order of the District Court.

¶2    The issue on appeal is whether the District Court erred when it found that the arresting police officer had a particularized suspicion to stop Fisher's vehicle.

FACTUAL AND PROCEDURAL BACKGROUND

¶3    At around 5:30 a.m. on May 5, 2001, Jordan Aguilar, a police officer with eight years of law enforcement experience, was patrolling the west end of Billings when he was  dispatched to South 31st Street, an area in Billings that is known to police officers for its high crime rate.  The dispatch was based on a report from an unknown caller that three or four people had been seen on foot in an alley and that one of them was carrying a gun. Aguilar drove west on 5th Avenue South, and did not see anyone on foot in the alley or nearby.  However, while Aguilar's police car was near the corner of 5th Avenue South and South 31st Street, Aguilar saw a car approaching from approximately two blocks away, driving eastbound on 5th Avenue South.  Fisher was driving the car

2

and had one passenger.  When Fisher's car was about one block away from Aguilar's police car, it turned north onto South 32nd Street.

¶4    Aguilar followed Fisher's car.  After he turned onto South 32nd Street, he observed that Fisher's car had no license plates.  As Aguilar approached within two car lengths of Fisher's vehicle, and looked for the temporary sticker, Fisher turned east onto 3rd Avenue South.  After that turn, Aguilar noticed that there was a temporary sticker on Fisher's vehicle, but stated that he could not read the expiration date printed on the sticker.  Fisher's vehicle then turned south onto South 31st Street and drove back to 5th Avenue South, the street where Aguilar first noticed Fisher's vehicle.  At that point, Fisher stopped the vehicle.  After the stop, when Fisher was unable to provide identification, Aguilar asked Fisher to exit the vehicle.  During a pat-down for weapons, Aguilar discovered drug paraphernalia, and arrested Fisher.

¶5    The State charged Fisher with criminal possession of dangerous drugs and criminal possession of drug paraphernalia.  Fisher moved to suppress the inculpatory evidence produced from Aguilar's stop.  At the suppression hearing, Aguilar gave the following testimony regarding his motivation for the stop:

> It was a pretty dangerous type of a call.  I saw this vehicle, and when we neared each other, it turned away from me, and I thought that possibly he was trying to kind of like, once he could see it was a police car, I felt he turned away from me.  I wanted to see what he was doing.  I followed him.  I thought that could have been the people I was looking for and they were trying to elude me.  When I started following it, I saw it had no plate.  I wanted to see what the vehicle was doing, because if it was the vehicle I was looking for and had a plate, that would be some way of identifying the

3

registered owner, and later if that was the person I was looking for from the original call, I could have the number logged into my dispatch log, to whereas if something turned out on that call later, that could be a way we could locate that vehicle later or help solve the case from that.

Aguilar admitted that he did not observe Fisher violate any traffic laws and that the lack of a rear license plate motivated his decision to stop Fisher "to a point." He testified that "[t]he fact that it didn't have a plate, but it had a sticker, isn't real suspicious in itself. There are tons of vehicles that are like that. Whether or not the sticker was valid or not makes another difference." Aguilar confirmed that the vehicle's sticker was valid. Furthermore, when questioned by the District Court about the temporary sticker issue, counsel for the State told the Court that it had abandoned the claim that Aguilar stopped Fisher on suspicion of violating vehicle registration laws, and that the State was "strictly relying on the suspicious driving." When Fisher's counsel reminded the court that Aguilar had previously testified that the license plate motivated his stop "to a point," the State's counsel again responded that "[t]he State is not relying on that argument in this. We're relying strictly on his suspicious driving."

¶6    On October 31, 2001, the District Court issued Findings of Fact, Conclusions of Law and an Order that denied Fisher's motion to suppress. Fisher pled guilty to both counts, reserving the right to appeal the District Court's denial of his motion to suppress.

STANDARD OF REVIEW

4

¶7 We review the District Court's denial of a motion to suppress to determine whether the District Court's findings of fact are clearly erroneous and whether its conclusions of law are correct. *State v. Jarman*, 1998 MT 277, ¶ 8, 292 Mont. 391, ¶ 8, 967 P.2d 1099, ¶ 8. The District Court's findings of fact are clearly erroneous where not supported by substantial evidence, where the court misapprehends the effect of the evidence, or where this Court's consideration of the record results in a firm conviction that a mistake has been made. *Jarman*, ¶ 8.

DISCUSSION

¶8 Did the District Court err when it found that the arresting police officer had a particularized suspicion to stop Fisher's vehicle?

¶9 The District Court found that based on the totality of the circumstances, Aguilar had a particularized suspicion sufficient to stop Fisher's vehicle. The District Court found that the following objective data supported a particularized suspicion that Fisher had engaged in or was engaged in criminal conduct:

> [Aguilar] was specifically looking for suspicious males; he was in one of the highest-crime areas in Billings; he searched the area he was supposed to and found no one; he observed no one else nearby until he saw only one vehicle approaching his police car; this lone vehicle turned away from his when the two vehicles were close enough that Officer Aguilar's identity as a police officer was apparent; the vehicle made several turns and appeared to be attempting to elude or avoid him, but not in a reckless fashion; and after Officer Aguilar followed the vehicle on its circuitous route, he observed it return to the area it first approached his patrol car. Also, the temporary sticker, which the officer couldn't see clearly, supports the particularized suspicion.

5

The District Court concluded that, following the reasoning in *Illinois v. Wardlow* (2000), 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570, Fisher's driving suggested "nervous and evasive behavior" which the court could consider in determining whether a particularized suspicion existed. In addition, the District Court concluded that this case was factually similar to our decision in *State v. Henderson*, 1998 MT 233, 291 Mont. 77, 966 P.2d 137, and that Aguilar's "inability to plainly view the sticker was sufficient to give rise to a particularized suspicion the vehicle was not properly registered."

¶10 Fisher contends that the District Court erroneously applied *Wardlow* and that under the totality of the circumstances there was insufficient information for Aguilar to form a particularized suspicion that Fisher was, had been, or planned to be, involved in criminal activity. Fisher contends that his driving was not "unprovoked avoidance" or "headlong flight" as discussed in *Wardlow* and that *Wardlow* is not on point. Similarly, Fisher contends that the District Court misapplied our decision in *Henderson* to this matter because, unlike *Henderson*, Aguilar had not formed an actual suspicion that Fisher's vehicle violated any vehicle registration laws. Fisher further points out that the State disclaimed that the vehicle sticker contributed to Aguilar's particularized suspicion, and therefore waived that justification, and that the District Court erred by later considering it.

¶11 The State, however, contends that there was sufficient objective data to support a particularized suspicion that Fisher was involved in criminal activity. The State contends that the

6

District Court did not rely upon Fisher's "unprovoked evasion" as conclusive evidence that a particularized suspicion existed, but when considered in the context of the other available information, it could be considered to form a particularized suspicion. The State also contends that the District Court did not err when it considered this Court's decision in *Henderson* and found that Aguilar's inability to read Fisher's temporary sticker could cause a particularized suspicion that Fisher's vehicle was not properly registered.

¶12 The parties do not dispute that Aguilar's investigative stop constituted a "search" or "seizure" of Fisher's person such that the Constitutional protections provided in our State and U.S. Constitutions against unreasonable searches and seizures apply. *State v. Bauer*, 2001 MT 248, ¶ 13, 307 Mont. 105, ¶ 13, 36 P.3d 892, ¶ 13; Art. II, Sec. 11, Mont. Const.; U.S. Const., amend. IV. We presume that all warrantless investigative stops are unreasonable searches, unless the State can prove "(1) objective data from which an experienced officer can make certain inferences; and (2) a resulting suspicion that the occupant of a certain vehicle is or has been engaged in wrongdoing." *State v. Gopher* (1981), 193 Mont. 189, 194, 631 P.2d 293, 296. The existence of a particularized suspicion depends upon the totality of the circumstances. *Anderson v. State Dept. of Justice* (1996), 275 Mont. 259, 263, 912 P.2d 212, 214. When evaluating the totality of the circumstances, "this Court considers the quantity, or content, and quality, or degree of reliability, of the information available to the officer at the time of the investigatory stop." *State v.*

7

*Van Kirk*, 2001 MT 184, ¶ 15, 306 Mont. 215, ¶ 15, 32 P.3d 735, ¶ 15 (citing *State v. Gilder*, 1999 MT 207, ¶ 11, 295 Mont. 483, ¶ 11, 985 P.2d 147, ¶ 11). We noted that "objective data may be based on 'various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers.'" *State v. Anderson* (1993), 258 Mont. 510, 514, 853 P.2d 1245, 1248 (quoting *U.S. v. Cortez* (1981), 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621). Montana's statutory provision regarding particularized suspicion provides:

> Investigative Stop. In order to obtain or verify an account of the person's presence or conduct or to determine whether to arrest the person, a peace officer may stop any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense.

Section 46-5-401, MCA.

¶13 We first address the State's claim that Aguilar had a particularized suspicion that Fisher was in violation of vehicle registration laws set forth in §§ 61-3-301, -317, MCA. Section 61-3-301(1), MCA, makes it a misdemeanor to operate a motor vehicle without a "conspicuously displayed" license plate. Section 61-3-317, MCA, provides a twenty-day grace period from that requirement so long as the vehicle has a temporary registration sticker "clearly displayed." Here, there is no dispute that while Fisher's vehicle did not have a license plate, it did have a temporary sticker "clearly displayed" on the vehicle. Aguilar could see it from at least one block away. There was no evidence to the contrary. Although Aguilar testified that he could not clearly

8

read the date printed on the sticker, he did not testify that he had any suspicion, particularized or not, that Fisher's vehicle violated any vehicle registration laws. This is presumably why the State waived this argument in the District Court. Accordingly, we conclude that the District Court erred when it found that Aguilar had a particularized suspicion to stop Fisher's vehicle based on non-compliance with vehicle registration laws.

¶14 This case is distinguishable from *Henderson*, which the District Court relied upon to justify the stop and which the State suggests is instructive in this case. In *Henderson*, a police officer observed Henderson driving a vehicle without front or rear license plates. *Henderson*, ¶ 4. The officer followed Henderson and observed what appeared to be a temporary sticker in Henderson's rear window, however, the windows in Henderson's vehicle were darkly tinted and the officer could not tell whether the sticker was valid. *Henderson*, ¶ 4. We noted that the officer "was unable to verify the validity of the sticker because the writing on the paper and the identifying pink stripe generally found on a temporary tag were not discernible from a distance through the darkened window" and that the officer could not even read the form up close through the window without the aid of a flashlight. *Henderson*, ¶ 14. We concluded from these facts that the officer had a particularized suspicion to conclude that Henderson was in violation of § 61-3-317, MCA, even though the sticker was later found to be valid, because it was not clearly displayed under those circumstances. *Henderson*, ¶ 14. Here, that was not the case. Accordingly, the District Court misapplied *Henderson* when it found

9

that Aguilar's inability to read the temporary sticker was sufficient objective data to form a particularized suspicion.

¶15 The remaining objective data that Aguilar observed before stopping Fisher's vehicle included (1) an initial anonymous report that three or four people were in an alley with a gun; (2) the fact that Aguilar's investigation and observation of Fisher occurred in a "high-crime area;" and (3) Aguilar's observations of Fisher's driving.

¶16 With respect to the police report, we conclude that none of the information in the report was connected to Fisher. Nothing suggests that the description of the persons in the report matched Fisher or his passenger. Aguilar merely testified that he wanted to obtain the identity of the people in Fisher's vehicle for his later investigation of the tip.

¶17 In *State v. Anderson*, however, we rejected the State's claim that a stop is justified in order to corroborate a tip. In *Anderson*, an informant told police that Anderson was planning to leave Libby, Montana, in a blue Toyota pickup to go to Washington to pick up a large quantity of marijuana and planned to return to Montana in that pickup that evening. Police dispatched two patrol cars to separate highways near the Idaho-Montana border. Officers located the described pickup, confirmed it matched the informant's description, and pulled over the pickup. We held that the informant's tip was insufficient objective data to form a particularized suspicion. *Anderson*, 258 Mont. at 515, 853 P.2d at 1248. We stated:

> A tip that has not been shown to be reliable or trustworthy for purposes of establishing probable cause to procure a search warrant is also unreliable for purposes of providing an officer with a particularized suspicion. An uncorroborated, unreliable tip is not objective data as contemplated by *Cortez* and *Gopher*.

*Anderson*, 258 Mont. at 516, 853 P.2d at 1249. We concluded:

> Instead of conducting independent investigation to corroborate the tip, the officers relied on the tip to stop the pickup and gather information to justify the stop in the first place. Officer Bernall testified that the very purpose of stopping and searching Anderson's pickup was to investigate whether Anderson was transporting drugs and to confirm that the tip was reliable so that a search warrant could be obtained. To condone a search of the defendant under these circumstances would render the right to be free from unreasonable searches and seizures meaningless.

*Anderson*, 258 Mont. at 516, 853 P.2d at 1249. Here, there was even less information to justify a stop of Fisher's vehicle: neither Fisher, his passenger, nor his vehicle matched any description of persons or vehicles in any report and the report itself did not suggest a crime had been committed; Aguilar testified that he wanted to know who was in the vehicle; and Aguilar admitted that when he stopped Fisher, he did not discuss the suspicious activity reported, despite his earlier testimony that the activity was "dangerous." The tip was anonymous, uncorroborated, unconnected to Fisher and we hold that it did not establish a particularized suspicion sufficient to stop Fisher.

¶18 We next consider whether the fact that this stop occurred in a "high-crime area" combined with Fisher's alleged "nervous and evasive" driving created a particularized suspicion that Fisher was engaged in criminal activity. The State suggests that the United States Supreme Court's decision in *Wardlow* is instructive. In

*Wardlow*, police officers entered an area known for heavy drug trafficking in a four car caravan, and observed Wardlow standing next to a building carrying an opaque bag. *Wardlow*, 528 U.S. at 121-22, 120 S.Ct. at 674-75. The officers observed Wardlow look in the officers' direction and immediately flee on foot. The officers followed Wardlow, stopped him, and arrested him after a pat-down search revealed a handgun. 528 U.S. at 122, 120 S.Ct. at 675. Under those circumstances, the Supreme Court found that the stop was justified. The Court found that the fact that a stop occurred in a "high crime area" is a "relevant contextual consideration" for determining whether there is a particularized suspicion. *Wardlow*, 528 U.S. at 124, 120 S.Ct. at 676. In addition, the Supreme Court held that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124, 120 S.Ct. at 676 (citations omitted). The Supreme Court reasoned:

> Headlong flight--wherever it occurs--is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such. In reviewing the propriety of an officer's conduct, courts do not have available empirical studies dealing with inferences drawn from suspicious behavior, and we cannot reasonably demand scientific certainty from judges or law enforcement officers where none exists. Thus, the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior.

*Wardlow*, 528 U.S. at 124-25, 120 S.Ct. at 676 (citation omitted).

¶19  Unlike *Wardlow*, Fisher's driving was not "headlong flight" nor "the consummate act of evasion." Fisher made an entirely legal and ordinary turn on a public street. In addition, nothing in the record suggests that Aguilar sufficiently observed Fisher himself to describe him as nervous and evasive. Unlike *Wardlow*, where the

12

pedestrian sprinted away upon seeing a patrol of police cars, *i.e.* "the consummate act of evasion," the only suggestion that Fisher's ordinary maneuver was evasive was Aguilar's inference. Without more objective data, there was insufficient objective data from which Aguilar could form a particularized suspicion that Fisher was engaged in criminal activity based on the operation of his motor vehicle.

¶20 Nor do we agree with the State's contention that Fisher's subsequent turns leading back to the street he originally left is sufficient objective data from which Aguilar could form a particularized suspicion.

¶21 Aguilar admitted that he had no difficulty following Fisher, that he remained within one block and two car lengths from Fisher's car, that Fisher violated no traffic laws and made no unusual turns nor movements, and that Fisher maintained an appropriate speed. The only additional objective data that Aguilar observed while following Fisher was that Fisher drove to the original street where Aguilar first observed him. Without more objective data, we conclude that under these circumstances Fisher's operation of his motor vehicle did not provide sufficient objective data from which an officer could form a particularized suspicion that the driver was engaged in criminal activity, and that Aguilar's stop violated Fisher's right to be free from unreasonable searches and seizures.

¶22 For the foregoing reasons, the District Court's order denying Fisher's motion to suppress evidence is reversed.

                                        /S/ TERRY N. TRIEWEILER

We Concur:

/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON