**FILED**

July 1 2008

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2008 MT 229

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

COLTER FLEMINGS,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Fifth Judicial District,
In and For the County of Jefferson, Cause No. DC-2004-1944
Honorable Loren Tucker, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Jack H. Morris; Jardine & Morris, Whitehall, Montana

      For Appellee:

      Hon. Mike McGrath, Montana Attorney General; Jennifer M. Anders
Assistant Attorney General, Helena, Montana

      Matthew J. Johnson, Jefferson County Attorney, Boulder, Montana

Submitted on Briefs:  October 11, 2006

Decided:  July 1, 2008

Filed:

_____
                         Clerk

Chief Justice Karla M. Gray delivered the Opinion of the Court.

¶1 Colter Flemings (Flemings) appeals from the judgment entered by the Fifth Judicial District Court, Jefferson County, on his convictions and sentences for 10 counts of felony burglary, 6 counts of felony theft and 1 count of attempted felony theft. We affirm.

¶2 The issue on appeal is whether the District Court erred in denying Flemings' motion to suppress evidence.

## BACKGROUND

¶3 The State of Montana (State) charged Flemings by information with 10 counts of felony burglary, 7 counts of felony theft, 4 counts of misdemeanor theft and 2 counts of misdemeanor criminal mischief. The State later amended the information to include misdemeanor charges of driving while suspended or revoked and failure to carry proof of insurance. Flemings pled not guilty to all charges. He then moved to suppress all evidence obtained—and statements made—during and after the investigatory stop which led to his arrest and the subsequent charges against him, asserting that the law enforcement officer involved did not have particularized suspicion to justify the stop. The District Court held an evidentiary hearing on the motion to suppress at which Jefferson County Sheriff's Deputies Scott Rogstad (Rogstad) and Chad McFadden (McFadden), burglary victim Scott Smith (Smith), and defense investigator Albert Johnson testified. The testimony from the hearing established the following factual scenario leading up to Flemings' arrest.

2

¶4 Between June of 2003 and April of 2004, the Jefferson County Sheriff's Department (JCSD) investigated a series of burglaries occurring at various private residences in the Cataract Creek drainage, near Basin, Montana. Cataract Creek Road is the main access road from Basin into the drainage, which is a remote, forested area. The drainage contains several privately-owned cabins, but there are no year-round residents and no one was staying in any of the cabins on the day in question. One of the cabins in the drainage is owned by Smith, whose permanent residence is in Laurel, Montana. Smith's cabin had been broken into several times prior to April of 2004. As a result, Smith had installed a security system utilizing motion-sensitive cameras which would send e-mail alerts and pictures to both Smith and the JCSD when activated.

¶5 At approximately 3:00 p.m. on April 26, 2004, the JCSD dispatch center received a computer alert that a motion-sensitive camera at Smith's cabin had been triggered. The alert included a picture showing that the door to a shed on Smith's property was open. Rogstad, who had just come into the dispatch center to begin his shift, left immediately to drive to the Smith cabin and investigate. In the meantime, the dispatcher contacted Smith, who also had received the computer alert at his home in Laurel, and Smith confirmed he had been at the Cataract Creek property the day before and left the shed door closed and locked. The dispatcher relayed this information to Rogstad.

¶6 Rogstad testified that it took approximately 10 minutes for him to drive from the dispatch center in Boulder, Montana, to the base of Cataract Creek Road near Basin. It took Rogstad an additional 10 to 15 minutes to drive the approximately 4.5 miles to the Smith

3

cabin due to the muddy and snowy condition of the road. He did not observe any people or vehicles while driving up the road. Upon reaching the Smith cabin, Rogstad checked the gate at the front entrance; it was locked and secure. He then drove further up the road, circling around behind the cabin to check the rear entrance. From a small hill behind the cabin, Rogstad observed a log splitter sitting just outside the gate to the cabin's back entrance. He further observed that the back gate had been taken off its hinges and set aside on the ground. Rogstad testified that the log splitter was of a size and weight that would require a vehicle with a tow hitch to move it. He also knew from previous visits to the Smith cabin that the log splitter usually was kept in a shed and tied down with airline cable.

¶7    Rogstad approached the rear of the Smith property on foot and observed tire tracks and footprints indicating where someone had pulled the log splitter from the shed to outside the gate. From these observations, Rogstad determined a burglary recently had been attempted or was still in progress. He then called McFadden to respond to the cabin as backup. McFadden was dispatched at 4:00 p.m. He first attempted to reach the Smith cabin via an alternate route up High Ore Road. High Ore Road was blocked by snow, however, and McFadden had to retrace his route and approach the cabin via Cataract Creek Road. He arrived at the Smith cabin at approximately 4:30. McFadden did not observe any people or vehicles while traveling either road.

¶8    Rogstad and McFadden then entered on to the Smith property to investigate. They observed that the shed door had been broken open and an unsuccessful attempt had been made to kick open the door to the cabin. The deputies believed that one person, or possibly

4

two people, had broken into the property and attempted to commit a theft. The deputies then drove further up Cataract Creek Road to another cabin (the Brown cabin) and discovered that cabin had also recently been broken into. As a result of their investigations at both cabins, the deputies believed that whoever committed the break-ins was still in the area or would be returning later to retrieve the log splitter at the Smith cabin. The deputies could not travel up Cataract Creek Road beyond the Brown cabin because the road was snowed in.

¶9 The deputies drove back down and investigated Uncle Sam Road, which splits off Cataract Creek Road just below the Smith cabin. They discovered two males and a female loading firewood into the back of a pickup truck on Uncle Sam Road. The deputies conducted an investigative stop, requested identification from the individuals and discovered an arrest warrant existed for the female. Rogstad arrested the female pursuant to the warrant and transported her to Boulder at approximately 8:10 p.m. McFadden then continued his investigation on Uncle Sam Road, discovering it also was snowed in and provided no egress from the Cataract Creek drainage. At approximately 8:30 p.m., McFadden left Cataract Creek drainage to investigate the nearby Basin Creek drainage.

¶10 Shortly thereafter, dispatch informed McFadden that Smith had arrived at his cabin, and the deputy returned to Cataract Creek. McFadden and Smith then began reviewing information from the cabin's surveillance equipment. At approximately 11:00 p.m., they heard what they thought was a vehicle drive past the cabin. McFadden contacted Rogstad, who was returning to the cabin and had just reached the base of Cataract Creek Road at Basin. Rogstad did not observe any vehicles while traveling up Cataract Creek Road to the

5

Smith cabin. The two deputies left the cabin at 12:30 a.m., leaving Smith at the cabin. Rogstad went off duty at that time and returned to Boulder. McFadden parked at the base of Cataract Creek Road for about an hour, waiting to see if any vehicles drove up or down the road, but he observed nothing. He returned to the dispatch center in Boulder at 1:49 a.m., just when Smith called dispatch to inform that a vehicle had just driven past his cabin headed down Cataract Creek Road. McFadden immediately returned to the area.

¶11 Less than a mile up Cataract Creek Road, McFadden observed a four-wheel drive pickup truck approaching his vehicle. Because only about 10 minutes had passed since he had left Boulder, McFadden believed the truck to be the vehicle Smith reported going past the cabin. After the truck passed him, McFadden turned his vehicle around and initiated an investigatory stop. McFadden informed the driver—later identified as Flemings—of the recent burglaries and asked Flemings why he was in the area. McFadden also requested Flemings' driver's license, vehicle registration and proof of insurance. Dispatch informed McFadden that Flemings' driver's license was suspended and there was an arrest warrant for him from another county. McFadden arrested Flemings for driving with a suspended license and transported him to Boulder. The following day, a JCSD investigator interviewed Flemings regarding the series of burglaries in the Cataract Creek drainage. Flemings made various incriminating statements. The JCSD then obtained warrants to search Flemings' vehicle and residence, and seized evidence pertaining to the Cataract Creek burglaries. The seized evidence and incriminating statements eventually led to the State filing an information charging Flemings with the above-mentioned offenses.

6

¶12    After hearing the testimony of the witnesses at the suppression hearing, the District Court entered oral findings of fact and conclusions of law. The court determined that, under the circumstances, McFadden had a reasonable suspicion of wrongdoing sufficient to justify the investigative stop of Flemings' vehicle. On that basis, the court denied Flemings' motion to suppress evidence.

¶13    Flemings and the State then entered into a plea agreement under which Flemings agreed to plead guilty to 10 counts of felony burglary, 6 counts of felony theft and 1 count of attempted felony theft. In return, the State agreed to dismiss the remaining charges against Flemings and to make a specified sentencing recommendation to the District Court. The plea agreement allowed Flemings to appeal the court's denial of his motion to suppress. The District Court accepted Flemings' guilty pleas, sentenced him, and entered judgment on the convictions and sentences. Flemings appeals.

## STANDARD OF REVIEW

¶14    We review a district court's ruling on a motion to suppress evidence to determine whether the court's findings of fact are clearly erroneous and whether the court correctly interpreted and applied the law to those facts. *State v. Benders*, 2006 MT 275, ¶ 9, 334 Mont. 231, ¶ 9, 146 P.3d 751, ¶ 9.

## DISCUSSION

¶15    *Did the District Court err in denying Flemings' motion to suppress evidence?*

¶16    "[A] peace officer may stop any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has

7

committed, is committing, or is about to commit an offense." Section 46-5-401(1), MCA. Where a defendant challenges the legality of an investigative stop, the State must establish that a particularized suspicion for the stop existed by showing objective data from which an experienced officer could make certain inferences which resulted in a suspicion that the occupant of the stopped vehicle is, has been or is about to be engaged in wrongdoing. *Benders*, ¶ 11. The existence of particularized suspicion is a question of fact which depends on the totality of the circumstances surrounding the investigative stop. In evaluating the totality of the circumstances, we consider the quantity and quality—or the content and degree of reliability—of the information available to the officer. *Benders*, ¶ 11.

¶17 Flemings contends the District Court erred in denying his motion to suppress evidence because McFadden did not have sufficient particularized suspicion to justify an investigative stop of his vehicle. He argues that the State failed to meet the first prong of the particularized suspicion analysis because no objective data existed from which McFadden could infer that Flemings was committing or had committed an offense. Flemings contends that McFadden's only articulated basis for the investigative stop was his location in the Cataract Creek drainage at the time of the stop, and that he "was stopped because of where he was, and for no other reason." Relying on *State v. Jarman*, 1998 MT 277, 291 Mont. 391, 967 P.2d 1099, and *State v. Fisher*, 2002 MT 335, 313 Mont. 274, 60 P.3d 1004, Flemings asserts that being in a certain place at a certain time, without anything more, does not rise to a particularized suspicion of wrongdoing and, therefore, is an insufficient basis on which to conduct an investigative stop.

8

¶18    In *Jarman*, a police officer was dispatched to respond to a domestic disturbance call. The female who had made the call reported to the officer that she and her boyfriend had a fight, and that the boyfriend might be on his way to an apartment building three blocks away. *Jarman*, ¶ 3. The officer drove toward the apartment building and, while doing so, observed a male individual, later identified as Jarman, standing next to a vehicle at an outdoor pay telephone. The officer observed no other people or traffic in the area. The officer drove around the block and returned to the pay telephone. The individual and vehicle were gone, and the telephone was hanging off the hook. *Jarman*, ¶ 4. The officer continued to patrol and observed Jarman's vehicle leaving the parking lot of an apartment complex. He initiated a traffic stop of Jarman's vehicle, during which he found a knife in plain view in the vehicle and drugs and a gun on Jarman's person. Jarman was arrested and subsequently moved to suppress the evidence found by the officer on the grounds that there was no particularized suspicion for the initial stop of his vehicle. The district court denied the motion and Jarman appealed. *Jarman*, ¶¶ 5-6.

¶19    On appeal, we concluded no objective data supported an inference that Jarman was the person involved in the domestic dispute except that he was the only male the officer observed in the area. We further determined, contrary to the officer's testimony, that Jarman's movements prior to the stop could not support a reasonable inference that he was trying to elude the officer. *Jarman*, ¶¶ 11-12. Thus, the only objective data the officer had was his observation of Jarman talking on a pay telephone on a cold night in a high crime area, and Jarman's absence when the officer drove around the block and returned to the

9

telephone. *Jarman*, ¶ 15. We noted that "[b]eing in a high crime area by itself does not give the police a particularized suspicion to stop a person." *Jarman*, ¶ 14 (citing *Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 2641 (1979)). As a result, the officer's observation of Jarman on a pay telephone in a high crime area, without more, did not rise to a particularized suspicion of wrongdoing and the investigative stop was illegal. *Jarman*, ¶¶ 15-16.

¶20 In *Fisher*, a police officer was dispatched to an area of town known to have a high crime rate based on an anonymous report that three or four people were seen on foot in an alley, and one was carrying a weapon. Upon arriving in the area, the officer did not see anyone on foot in or near the alley. While patrolling the area, however, he observed a vehicle approaching. The vehicle contained the driver, later identified as Fisher, and one passenger. The vehicle turned onto another street when it was a block away from the officer's patrol car. *Fisher*, ¶ 3. The officer followed Fisher's vehicle as it made several turns, eventually returning to the location where the officer first observed the vehicle. The officer noticed the vehicle had no license plates, but did have a temporary sticker in the rear window; however, the officer could not read the sticker's expiration date. The officer initiated a traffic stop of the vehicle and eventually arrested Fisher for possession of drug paraphernalia. *Fisher*, ¶ 4. Fisher moved—unsuccessfully—to suppress the evidence obtained as a result of the investigative stop. *Fisher*, ¶¶ 5-6. On appeal, he argued that the district court erred in denying his suppression motion because the officer had insufficient information to form a particularized suspicion that he was committing an offense. *Fisher*, ¶ 10.

¶21     We first concluded that the officer's inability to read the temporary sticker on Fisher's vehicle was not objective data supporting a particularized suspicion because the sticker was clearly displayed, as required by Montana law, and the officer did not testify that he had any suspicion Fisher's vehicle violated any vehicle registration laws. *Fisher*, ¶¶ 13-14. We further concluded that the initial anonymous tip did not provide objective data upon which to justify the traffic stop because the tip did not suggest a crime had been committed, the tip was uncorroborated and Fisher—who was driving a vehicle with one passenger on a main street at the time of the stop—did not match the tip's description of a group of three or four people on foot with a weapon in an alley. *Fisher*, ¶ 17. Finally, we concluded that, although Fisher was driving in an area with a high crime rate, no other objective data existed to raise this fact to the level of particularized suspicion of wrongdoing. No evidence suggested that Fisher's completely legal turns on public streets, made at an appropriate speed and leading him in a circular route, were evasive, furtive or indicative of "headlong flight." *Fisher*, ¶¶ 18-21. In other words, the officer had no objective data, other than the area having a high crime rate, upon which to form a particularized suspicion justifying a traffic stop. Thus, we concluded the investigatory stop was illegal and reversed the district court. *Fisher*, ¶¶ 21-22.

¶22     We agree that *Jarman* and *Fisher* support Flemings' assertion that observation of a person in an area known for its high crime rate does not, without more, constitute objective data from which an officer can infer wrongdoing resulting in a particularized suspicion justifying an investigative stop. We disagree, however, that this situation is before us in the present case. Flemings focuses on his location in Cataract Creek as the only information

11

available to McFadden and fails to consider other pertinent data. We conclude that, viewing the totality of the circumstances known to McFadden at the time he initiated the investigative stop, McFadden had significantly more objective data upon which to make inferences of wrongdoing than Flemings' mere presence in the area. Consequently, we conclude *Jarman* and *Fisher* are distinguishable from the present case.

¶23 In rendering its oral ruling denying Flemings' motion to suppress, the District Court first set forth the above-stated legal standards applicable in analyzing whether an investigative stop was legally conducted. The court then observed that the unrefuted evidence established that both Rogstad and McFadden have substantial experience and training in dealing with investigating major crimes and burglaries in particular. The court further determined that both officers had objective information which established that a burglary and attempted theft had occurred at the Smith cabin. This information included the computer photograph showing the open shed door—which Smith informed them had been closed and locked the previous day—as well as the officers' observations that the back gate had been removed from its hinges, the shed door forced open, the airline cable cut and the log splitter moved to outside the gate. The officers also observed that a burglary at the Brown cabin had occurred within the same time period.

¶24 The trial court also determined that, based on their experience and training, Rogstad and McFadden reasonably inferred from their observations and events that the suspect was still in the area and would return to complete the theft. These observations and events included Rogstad's arrival at the Smith cabin within 20 to 25 minutes after dispatch received

12

the computer alert without passing any vehicles coming down Cataract Creek Road, as well as the location where the log splitter had been left and the freshness of the tracks around it. Additionally, the officers discovered that the other roads which normally provided access to the Cataract Creek drainage were blocked by snow and, as a result, the only ingress and egress was via Cataract Creek Road itself. Neither officer having observed any vehicle driving down Cataract Creek Road, the officers reasonably inferred that the perpetrator was still in the drainage.

¶25 The District Court further found that the Cataract Creek drainage was a remote area with few residents—none of whom were at their cabins on the day in question except Smith, who arrived after the burglary—and the only other persons found in the area that day were the three woodcutters on Uncle Sam Road. The other indications of a vehicle in the area were McFadden and Smith hearing a vehicle drive by at approximately 11:00 p.m.—and Rogstad confirming to McFadden that the vehicle did not drive past him as he came up Cataract Creek Road—and Smith's report of a vehicle driving down the road at 1:49 a.m., which McFadden believed to be the vehicle he stopped approximately 10 minutes later. As the District Court observed,

> [t]hat's an unlikely period of time to travel. There were no businesses in the area, no homes in the area, and no reasons for persons to be out and about at that time. As already mentioned, the officers thought the suspect might still be in the area because of the limited opportunities for the perpetrator to get away from the area. That coincided with the fact that the suspect vehicle came down the creek, it was not traveling up the creek.

13

¶26 Finally, with regard to the amount of time which elapsed between the burglary and the investigative stop, and the possibility that vehicles came to or left the area unbeknownst to McFadden, the District Court determined that

> [Flemings] has emphasized, in the course of the examination and presentation of evidence, that the officers would stop any vehicle at all. Apparently, [Flemings'] premise also is over a wide area. At first blush, that may have some appeal, but the point to be considered here is that at that time, in that location, at that season of the year, there was virtually no or very few vehicles in the area at all. There was no reason for anybody to be in the area at all because of its remoteness, because of unoccupied residences, because of the time [of the] year, and because of the time of the night. And moreover, even though acknowledging that the area had not been sealed off entirely, the officers had investigated thoroughly all of the surrounding areas and the drainage itself and had ascertained that there was no one in the area except for the ill-fated woodcutters. The court finds and concludes that the possibility of intervening factors, such as lapse of time and other vehicles which might have entered into the area, are insufficient to destroy the potential that [Flemings'] vehicle had a connection to the burglary.

Based on all the above findings and determinations, the District Court ultimately concluded that McFadden had sufficient objective data from which to infer that the driver of the vehicle coming down Cataract Creek Road at approximately 2:00 a.m. was or had been engaged in wrongdoing, thus resulting in a particularized suspicion justifying the investigative stop of Flemings' vehicle.

¶27 Flemings does not challenge the majority of the District Court's findings and determinations regarding the objective data known to McFadden as a result of his investigation and observations, and the inferences made from that data. Rather, Flemings contends the District Court's ultimate conclusion that McFadden had a particularized suspicion justifying a stop with regard specifically to Flemings' vehicle was erroneous.

14

Flemings asserts that "[n]othing in the record shows that McFadden was looking particularly for the vehicle Flemings was driving: there was no evidence regarding its type, whether a car or pickup truck, make, color, or license plates."

¶28    However, as Fleming himself observes in his brief, objective data supporting certain inferences may be based on various objective observations, information from available police reports, as well as consideration of the modes or patterns of operation of certain kinds of lawbreakers. *Fisher*, ¶ 12 (citations omitted). There are multitudes of types of objective data an officer may rely on in determining whether particularized suspicion exists to justify an investigative stop. Flemings points to no authority requiring an officer to connect a vehicle's make, model, color and/or license plates to the suspected crime before initiating a stop. Here, McFadden had sufficient objective data from which to reasonably infer that a person driving a vehicle down Cataract Creek Road in the early morning hours following a burglary and attempted theft at a cabin located up that same remote road may have been involved in the offense.

¶29    Furthermore, the determination of particularized suspicion does not require certainty on the part of the law enforcement officer. *State v. Trombley*, 2005 MT 174, ¶ 9, 327 Mont. 507, ¶ 9, 116 P.3d 771, ¶ 9; *see also State v. Morsette*, 201 Mont. 233, 240, 654 P.2d 503, 506 (1982). The process of assessing the totality of the circumstances deals with probabilities, not hard certainties, and evidence collected must be weighed as understood by those versed in the field of law enforcement. *Morsette*, 201 Mont. at 240, 654 P.2d at 506. Thus, we require a showing of objective data from which an experienced officer can make

15

certain inferences resulting in a *suspicion* that the occupant of the stopped vehicle is, has been or is about to be engaged in wrongdoing. *Benders*, ¶ 11.

¶30 We conclude that, under the totality of the circumstances, McFadden had sufficient objective data available to him from which he reasonably could infer that Flemings was or had been engaged in wrongdoing, thus creating a reasonable suspicion justifying the investigative stop of Flemings' vehicle. As a result, we hold that the District Court did not err in denying Flemings' motion to suppress evidence.

¶31 Affirmed.

/S/ KARLA M. GRAY

We concur:

/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ PATRICIA COTTER
/S/ JIM RICE