DA 13-0323

IN THE SUPREME COURT OF THE STATE OF MONTANA

2014 MT 234

STATE OF MONTANA,

        Plaintiff and Appellee,

v.

CHELSEA LYNN STROM,

        Defendant and Appellant.

APPEAL FROM:     District Court of the Second Judicial District,
In and For the County of Butte/Silver Bow, Cause No. DC 12-07
Honorable Kurt Krueger, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Wade Zolynski, Chief Appellate Defender; Nicholas Domitrovich,
            Assistant Appellate Defender; Helena, Montana

        For Appellee:

            Timothy C. Fox, Montana Attorney General; C. Mark Fowler, Bureau
            Chief, Appellate Services Bureau; Helena, Montana

            Eileen Joyce, Silver Bow County Attorney; Butte, Montana

Submitted on Briefs:  July 16, 2014

Decided:  September 2, 2014

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Defendant Chelsea Strom (Strom) appeals the order of the Second Judicial District Court, Silver Bow County, denying her motion to suppress evidence based upon an unlawful seizure.

¶2 We reverse and address the following issue:

¶3 *Did the District Court err by denying Defendant Strom's motion to suppress on the ground there had not been a seizure requiring particularized suspicion?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 On December 26, 2011, Strom was picked up by a 16-year-old friend, S.J., to go for a drive. S.J. was driving a van borrowed from a friend. The pair parked at Stodden Park to visit at approximately 9:40 a.m. Shortly after they arrived at the park, Butte Police Sgt. Ed Heard drove by on routine patrol. Sgt. Heard later explained that due to vandalism of the Korean War Memorial in the park, he tried to patrol the park at least once during his shift. He noticed the van, parked and not running, with two occupants inside. It was the only vehicle in the lot and though the park was open to the public at that time, Sgt. Heard believed it to be suspicious. He pulled up behind the van and parked his patrol car but did not activate his emergency lights. Based on the layout of the parking lot, and the fact that no other vehicles were in the lot, the van was not physically prevented from leaving the lot despite Sgt. Heard being parked behind it.

¶5 After parking behind the van, Sgt. Heard left his patrol car and approached the driver's side of the van. Sgt. Heard testified that as he approached the van he noticed "how young [S.J.] was" so he asked for her driver's license. S.J. informed Sgt. Heard

2

that she didn't have a driver's license and handed him her school ID. Sgt. Heard then asked Strom for identification and Strom provided an identification card. Sgt. Heard instructed S.J. and Strom to wait and took both IDs to his patrol car to check the driver's status and for warrants. He learned that S.J. did not have a driver's license and Strom had a warrant from Stillwater County for failure to appear. Sgt. Heard reapproached the vehicle from the passenger side, instructed Strom to step out of the vehicle, and placed her under arrest based on the outstanding warrant. He handed S.J. back her school ID and informed her that she could not drive. S.J. informed Sgt. Heard that she had been in touch with the vehicle's owner and he was on his way to pick up the van.

¶6      While being held in a cell at the detention center, Strom presented a detention officer with a baggie filled with a white substance and stated it was "crystal meth." The substance tested positive for methamphetamine, and Strom was charged with one count of criminal possession of dangerous drugs, a felony, on January 26, 2012.

¶7      Strom moved to suppress the evidence and statements pursuant to §§ 46-13-301 and -302, MCA. She argued that Sgt. Heard lacked particularized suspicion to perform an investigatory stop when he asked her and S.J. for identification, and that any evidence or statement obtained as a result of the illegal stop must be suppressed. The State countered that no investigatory stop had occurred and that Sgt. Heard had discovered the warrant after a voluntary conversation with citizens who were free to leave at any time. The District Court denied Strom's motion, finding that there had not been a seizure for which particularized suspicion was required. Strom subsequently pled guilty pursuant to

3

a plea agreement, reserving her right to appeal the court's denial of her motion to suppress.

## STANDARD OF REVIEW

¶8 We review a denial of a motion to suppress to determine whether the lower court's findings of fact were clearly erroneous and whether it correctly applied the law to those findings. *State v. Graham*, 2007 MT 358, ¶ 10, 340 Mont. 366, 175 P.3d 885.

## DISCUSSION

¶9 *Did the District Court err by denying Defendant Strom's motion to suppress on the ground there had not been a seizure requiring particularized suspicion?*

¶10 In reviewing Strom's allegation of an illegal seizure, we must first determine whether a seizure has occurred. Both the Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution protect citizens from unreasonable searches and seizures. However, we have recognized that "'not all personal intercourse between policemen and citizens involves "seizures" of persons.'" *State v. Wilkins*, 2009 MT 99, ¶ 8, 350 Mont. 96, 205 P.3d 795 (quoting *Terry v. Ohio*, 392 U.S. 1, 19-20 n. 16, 88 S. Ct. 1868, 1879 n. 16 (1968)). In determining whether a seizure has occurred, we apply the same test under both the federal and Montana constitutions. *State v. Case*, 2007 MT 161, ¶ 24, 338 Mont. 87, 162 P.3d 849. A person has been seized if, after viewing all the circumstances surrounding the incident, a reasonable person would not have believed that he or she was free to leave. *Case*, ¶ 24. We adopted this test from the United States Supreme Court's decision in *United States v. Mendenhall*, 446 U.S. 544, 100 S. Ct. 1870 (1980). In *Mendenhall*, the Supreme Court

4

provided examples of circumstances that may indicate a person was seized, including "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554, 100 S. Ct. at 1877. We have repeatedly relied on these factors, often referred to as the *Mendenhall* factors, in seizure cases but we have also explained that the test is an objective one and "is necessarily imprecise and will vary depending on the setting in which the conduct occurs." *State v. Clayton*, 2002 MT 67, ¶¶ 22-23, 309 Mont. 215, 45 P.3d 30. The *Mendenhall* factors may be helpful in certain cases, but we have recognized that they are not exhaustive. *Wilkins*, ¶ 12.

¶11 As a preliminary matter, Strom argues that we should overrule our past cases utilizing the *Mendenhall* test. It appears that Strom advocates for a rejection of the "reasonable person/free to leave standard" in favor of a more subjective test based on the age and knowledge of the citizen claiming to have been seized. The State counters that Strom's request to reject decades of case law in favor of a vague and poorly defined rule has scant legal support and "no record facts to support her position." We agree that rejection of the *Mendenhall* test is not warranted in this case.

¶12 The District Court agreed with the State's argument that, under the facts of this case, no seizure had occurred. The State argues that our holding in *Wilkins* is controlling. In *Wilkins*, an officer was on routine patrol at 1:30 a.m. when he noticed a vehicle with its lights on parked halfway down a side street next to a salvage yard. The location where the vehicle was parked was a dark, remote area occupied by mostly industrial businesses

5

that were closed at that time. The officer drove past the vehicle and noticed that it was running. *Wilkins*, ¶ 2. The officer found the vehicle to be suspicious because it was unusual for a vehicle to be in the area, running and with its lights on, at that time of night, and that there had been recent burglaries in the area. The officer was also concerned about the welfare of the driver because it was a cold night, near or below freezing, and the vehicle was in an isolated location. The officer approached the vehicle and spoke to the driver. While speaking with her, the officer noticed the smell of alcohol and that Wilkins' speech was slurred. The officer then conducted a DUI investigation and arrested Wilkins for DUI. *Wilkins*, ¶ 3. We upheld the district court's denial of Wilkins' motion to suppress, concluding that no seizure had occurred where the officer did not initiate the stop of the vehicle and did nothing to impede the driver's liberty by means of physical force or show of authority, such as activating his emergency lights or shining a spotlight in the vehicle. The initial contact with Wilkins was a voluntary exchange, and the later DUI investigation was supported by particularized suspicion gained through this exchange. *Wilkins*, ¶¶ 14-15.

¶13    Although there are similarities between this case and *Wilkins*, distinctions justify a different result here. Unlike the casual conversation with the driver initiated by the officer in *Wilkins* to check on her welfare and the unusual circumstances of the running and lighted vehicle's presence in the area at that time of day, Sgt. Heard's first communication with both S.J. and Strom, properly parked in a public-use area in broad daylight, was a demand of them to produce identification. After first obtaining a student ID from S.J., Sgt. Heard asked Strom if she "had any type of driver's license or

6

identification." He then took both women's IDs to his patrol car, instructing them to wait there, to check driver's status and warrants. Based on these facts, we conclude that a reasonable person would not have felt free to leave despite the fact that more compelling actions were not taken, such as the use of emergency lights, drawing of a weapon, or parking in such a way as to physically prevent the van from departing, and, therefore, both women were seized at that time.[1]

¶14 A peace officer may stop an individual to conduct a brief investigation if the person or vehicle is "observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense." Section 46-5-401(1), MCA. A peace officer who has lawfully stopped a person may "request the person's name and present address and an explanation of the person's actions and, if the person is the driver of a vehicle, demand the person's driver's license and the vehicle's registration and proof of insurance." Section 46-5-401(2)(a), MCA.

¶15 To have particularized suspicion for an investigative stop, "the peace officer must be possessed of: (1) objective data and articulable facts from which he or she can make certain reasonable inferences; and (2) a resulting suspicion that the person to be stopped has committed, is committing, or is about to commit an offense." *Brown v. State*, 2009

---

[1] In his testimony, Sgt. Heard briefly mentioned that his intention when first approaching the van included checking on the welfare of the occupants due to the fact that it was a cold morning and the vehicle was not running. However, he first testified that he approached the vehicle because "it was—just looked suspicious to me," and the dispatch notes indicate that Sgt. Heard reported that he was checking on "suspicious activity." The State affirmatively states in its appellate briefing that it is not relying on the community caretaker doctrine as an alternative theory.

MT 64, ¶ 20, 349 Mont. 408, 203 P.3d 842. Whether or not particularized suspicion exists is a question of fact determined by looking at the totality of the circumstances. *Moore v. State*, 2002 MT 315, ¶ 10, 313 Mont. 126, 61 P.3d 746. In evaluating the totality of the circumstances, a court must consider the quality and quantity of the information available to the officer. *State v. Flemings*, 2008 MT 229, ¶ 16, 344 Mont. 360, 188 P.3d 1020.

¶16 Sgt. Heard testified that the only reason he asked Strom for her identification was because S.J. had just informed him that she did not have a driver's license and he needed to "see if we could have a licensed driver drive the vehicle." However, neither an inquiry from Sgt. Heard nor a statement from the women had been made establishing that Strom would drive the vehicle, or that she was licensed to drive. To the contrary, it was S.J.'s intention to contact the van's owner about retrieving it, which is what she did while Sgt. Heard was checking the women's identifications in his car. Based on the scant information available to Sgt. Heard at the time, we see no objective data or resulting suspicion that justified an investigation of Strom.

¶17 Although S.J. is not a defendant, neither was there particularized suspicion to stop or seize her that could support or properly lead to the subsequent investigation of Strom. The initial reason for requesting S.J.'s driver's license was that, on his approach to the vehicle, Sgt. Heard "noticed how the age—how young [S.J.] was." This statement is the only evidence in the record supporting an investigation into the identity and driving status of S.J. In Montana, a person at least 15 years of age may obtain a license if he or she has passed a driver's education course, and a person at least 13 years of age may obtain a

8

restricted license in cases of individual hardship. Section 61-5-105(1), MCA. While the apparent youthfulness of a driver may well constitute particularized suspicion for an officer to stop and check the driver's status, that concern was not the reason that Sgt. Heard stopped and approached the vehicle here. Rather, the stop and the request for identification was premised on Sgt. Heard's assessment of suspicious activity, for which there was no objective data to support.

¶18     We reverse and remand for further proceedings consistent with this Opinion.


/S/ JIM RICE

We Concur:

/S/ MICHAEL E WHEAT
/S/ LAURIE McKINNON
/S/ PATRICIA COTTER
/S/ JAMES JEREMIAH SHEA