FILED

09/21/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0703

DA 15-0703

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 236

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

STEVEN TODD HOOVER,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DC 14-223A
Honorable Katherine R. Curtis, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Chad Wright, Chief Appellate Defender, Koan Mercer, Assistant
Appellate Defender, Helena, Montana

      For Appellee:

            Timothy C. Fox, Montana Attorney General, Jonathan M. Krauss,
Assistant Attorney General, Helena, Montana

            Edward J. Corrigan, Flathead County Attorney, Andrew C. Clegg,
Deputy County Attorney, Kalispell, Montana

                    Submitted on Briefs:  May 24, 2017
                              Decided:  September 21, 2017

Filed:

_____
                       Clerk

Justice Dirk M. Sandefur delivered the Opinion of the Court.

¶1 Steven Todd Hoover (Hoover) appeals the order of the Montana Eleventh Judicial District Court, Flathead County, affirming the Flathead County Justice Court's denial of his motion to suppress evidence obtained subsequent to an investigative law enforcement stop. We reverse.

*Did the Justice Court erroneously deny Hoover's motion to suppress evidence?*

**BACKGROUND**

¶2 Sometime before midnight on August 2, 2013, Defendant Hoover, accompanied by an adult female acquaintance, drove his Ford pickup truck into a private mini-storage complex (AAA Mini-Storage) located just off Highway 2 East on the outskirts of Kalispell, Montana. The partially fenced complex had no gate and was open to the public 24 hours a day, seven days a week. The couple parked with their lights off in a dark and relatively secluded spot at the back end of the complex between two rows of storage units to engage in consensual intimacy on a warm summer night.

¶3 Just before midnight, while patrolling through an adjacent automobile dealership lot, Sgt. Phil Meredith, a Flathead County deputy sheriff with over 21 years of experience, 18 on patrol, noticed Hoover's vehicle parked in the dark between two storage unit rows on the publicly accessible lot. After stopping and turning off his lights to observe further, Meredith saw the silhouettes of two people sitting in the front seats of the parked truck. He later testified that he could not see what they were doing, but saw enough movement to tell that two people were in the truck.

2

¶4     Based on his experience that people do not commonly access storage units at midnight and his general awareness that storage units "are always being broken into," Sgt. Meredith immediately suspected that a storage unit break-in might be in progress and summoned other law enforcement officers in the area to assist him in contacting the occupants of the vehicle to investigate further. Upon the arrival of two more Flathead County sheriff's deputies and a Montana Highway Patrol (MHP) trooper, Meredith and the other officers gathered on foot at the entrance of the complex where they split into two groups and set out to sneak-up behind the truck and converge on the occupants from both sides.

¶5     Sgt. Meredith and the trooper crept up to a point about 10 to 15 yards behind the pickup where they could look around a storage unit and see the vehicle. Upon observing from that vantage point for "less than a minute," Meredith saw that the passenger side window was down and again saw the silhouettes of two people sitting in the pickup—one in the driver's seat and the other in the front passenger seat. He testified that he still could not see what the occupants were doing but the driver appeared to be looking down at the steering wheel or into his lap. Based on his experience that people often find a secluded spot to use illegal drugs, Meredith testified that, in addition to his initial suspicion of a possible break-in, he suspected that the driver might also be engaged in illegal drug activity, such as "either loading up a marijuana bowl or shooting up." However, Meredith articulated no specific observation, fact, or circumstance particularly indicative of such illegal drug use.

¶6    Without any additional information, the four officers left the cover of the storage units and walked up on the parked truck from the rear. Sgt. Meredith and the MHP trooper walked up along the passenger side and the other two deputies walked up along the driver's side. As they approached from behind on both sides of the truck, the officers heard nothing from inside the cab and saw only that the driver was still looking down towards his lap with the passenger "just sitting there."

¶7    When Sgt. Meredith and the trooper reached the open passenger side window, Meredith lit up the interior of the cab with his flashlight and announced the presence of law enforcement officers. Looking into the illuminated interior of the cab, Meredith saw Hoover sitting in the driver's seat with his penis exposed, masturbating while his fully clothed female companion was calmly watching from the front passenger seat. The officers saw no indication of a possible break-in, illegal drug use, or other illegal activity. The officers further observed no indication that Hoover's female companion was in distress, not free to leave, or in any way threatened or concerned about Hoover's conduct. Meredith later testified that the two people "were never close together."

¶8    Nonetheless, upon seeing what was going on, Sgt. Meredith became further concerned that Hoover might be engaged in indecent exposure or about to subject the woman to sexual intercourse without consent. He testified that he thought further intrusion and investigation was necessary to determine whether "the female was comfortable being there with a man exposing his penis." After first questioning Hoover's companion and confirming that she was there of her own free will, the officers began questioning Hoover.

4

Despite what he had clearly observed and confirmed, Meredith testified that he still thought further investigation was necessary to dispel his initial suspicion of a possible storage unit break-in. He articulated no specific factual basis for this continued suspicion.

¶9 While questioning Hoover, one or more of the officers noticed an alcoholic odor on his breath and requested a preliminary breath test (PBT).[1] Hoover consented and the PBT indicated a 0.05% blood alcohol concentration. Upon further inquiry, the officers ascertained that Hoover was on probation supervised by the Montana Department of Corrections. At the direction of an on-call probation officer, the officers arrested Hoover on suspicion of violating the alcohol restriction of his probation. Upon searching him incident to arrest, one of the officers found a small marijuana pipe with suspected residue in Hoover's pants pocket. The officers then transported him to jail and cited him into Flathead County Justice Court on the charge of Criminal Possession of Drug Paraphernalia, a misdemeanor in violation of § 45-10-103, MCA.

¶10 In Justice Court, Hoover filed a motion to suppress all evidence gathered incident to the "investigative stop" on the asserted ground that the officers lacked sufficient particularized suspicion to detain and question him about potential criminal activity. Following a hearing, the Justice Court denied the motion on the ground that no

[1] Other than an alcoholic breath odor, the record is silent as to what quantum of suspicion, if any, the officers had to request that Hoover submit to a PBT test. *See Hulse v. State*, 1998 MT 108, ¶¶ 30-38, 289 Mont. 1, 961 P.2d 108 (field sobriety tests infringe reasonable expectation of privacy and constitute a search requiring particularized suspicion of DUI); § 61-8-409(1), MCA (implied consent PBT on particularized suspicion of DUI); and *Bramble v. State*, 1999 MT 132, ¶ 29, 294 Mont. 501, 982 P.2d 464 (lack of particularized suspicion for field sobriety tests similarly constitutes lack of particularized suspicion for PBT). *See also*, § 61-8-406(1)(a), MCA (0.08% threshold for unlawful blood or breath alcohol concentration).

constitutional seizure of Hoover's person occurred, thus eliminating any legal requirement for particularized suspicion to conduct further investigation. Hoover then pled "no contest" to the drug paraphernalia charge, received a six-month deferred sentence, and appealed the denial of his suppression motion under a reservation of rights to the Montana Eleventh Judicial District Court.

¶11 On appeal, the District Court, Hon. Ted O. Lympus presiding, concluded that, under the totality of the circumstances, four uniformed police officers converging upon Hoover's parked pickup was a constitutional seizure requiring particularized suspicion of criminal activity to temporarily detain and question him. The District Court remanded back to Justice Court for an evidentiary hearing to determine whether sufficient particularized suspicion existed to justify the investigative stop. Upon hearing on remand, the Justice Court again denied Hoover's motion to suppress, this time on the undifferentiated finding and conclusion that the officers lawfully detained and continued to question Hoover on particularized suspicion of a possible break-in, illegal drug use, and/or non-consensual sexual activity. On appeal, the District Court, Hon. Katherine Curtis presiding, affirmed the Justice Court ruling, concluding that sufficient particularized suspicion of criminal activity existed to temporarily detain Hoover for questioning prior to arrest. Hoover appeals.

## STANDARD OF REVIEW

¶12 On appeal from a justice court of record, the district court functions as an intermediate appellate court confined to review of the record and questions of law.

Sections 3-5-303 and 3-10-115, MCA; *State v. Luke*, 2014 MT 22, ¶ 9, 373 Mont. 398, 321 P.3d 70.[2] On appeal of a district court's appellate review of a lower court ruling, we review the lower court ruling as if appealed directly to this Court without district court review. *State v. Maile*, 2017 MT 154, ¶ 7, 388 Mont. 33, 396 P.3d 1270. Upon independent review of the lower court record, our standard of review is whether the lower court's findings of fact are clearly erroneous, whether its conclusions of law are correct, and, as applicable, whether the lower court abused its discretion. *State v. Davis*, 2016 MT 206, ¶¶ 5-6, 384 Mont. 388, 378 P.3d 1192. A lower court's findings of fact are clearly erroneous only if not supported by substantial credible evidence, the lower court misapprehended the effect of the evidence, or we are nonetheless left with a firm and definite conviction that the lower court was simply mistaken. *Maile*, ¶ 8. Accordingly, our standard of review of a lower court's denial of a motion to suppress evidence is whether the lower court's findings of fact are clearly erroneous and whether it correctly applied the controlling law to those facts. *State v. Foster*, 2017 MT 118, ¶ 6, 387 Mont. 402, 394 P.3d 916; *State v. Massey*, 2016 MT 316, ¶ 7, 385 Mont. 460, 385 P.3d 544. We generally defer to a lower court's findings of fact but review its conclusions of law and application of legal standards de novo. *State v. Kaufman*, 2002 MT 294, ¶ 12, 313 Mont. 1, 59 P.3d 1166.

**DISCUSSION**

¶13 *Did the Justice Court erroneously deny Hoover's motion to suppress evidence?*

_____

[2] The Flathead County Justice Court is a court of record as defined by § 3-10-101(5), MCA.

7

¶14 The Fourth Amendment to the United States Constitution and Article II, section 11, of the Montana Constitution both protect individuals from unreasonable government searches and seizures. As a procedural component of these protections, government searches and seizures must generally occur pursuant to a judicial warrant issued on probable cause. *See* U.S. Const. amend. IV ("no Warrants" for search or seizure "shall issue, but upon probable cause, supported by Oath or affirmation, particularly describing the place to be searched, and the person or things to be seized") and Mont. Const. art. II, section 11 ("No warrant to search any place, or seize any person or thing shall issue . . . without probable cause"). Except for certain limited exceptions to the warrant requirement, warrantless searches and seizures are *per se* unreasonable under the Fourth Amendment and Montana Constitution, Article II, section 11. *State v. Hardaway*, 2001 MT 252, ¶ 36, 307 Mont. 139, 36 P.3d 900; *State v. McCarthy*, 258 Mont. 51, 55, 852 P.2d 111, 113 (1993); *Katz v. United States*, 389 U.S. 347, 358, 88 S. Ct. 507, 515 (1967). The fundamental purposes of the Fourth Amendment and Article II, section 11, are "to protect the privacy and security of individuals" from unreasonable government intrusion or interference. *State v. Clayton*, 2002 MT 67, ¶ 11, 309 Mont. 215, 45 P.3d 30; *accord United States v. Mendenhall*, 446 U.S. 544, 553-54, 100 S. Ct. 1870, 1877 (1980) (purpose of Fourth Amendment "not to eliminate all contact between the police and citizenry"—only "to prevent arbitrary and oppressive" government interference with individual privacy and security) (internal quotation marks omitted).

¶15    A constitutional seizure of a person occurs when a government officer "in some way" restrains a person's liberty "by means of physical force" or a "show of authority" that, under the totality of the circumstances, would cause an objectively reasonable person to feel not free to leave the presence of the government officer. *Clayton*, ¶ 12 (citing *Mendenhall*, 446 U.S. at 552-54, 100 S. Ct. at 1876-77); *accord State v. Roberts*, 1999 MT 59, ¶ 16, 293 Mont. 476, 977 P.2d 974 (citing *Mendenhall*); *Terry v. Ohio*, 392 U.S. 1, 16, 88 S. Ct. 1868, 1877 (1968) (seizure occurs whenever police accost an individual and restrain freedom to walk away).[3] Even a brief restraint of a person's liberty constitutes a seizure subject to the Fourth Amendment and Montana Constitution, Article II, section 11. *Massey*, ¶ 9; *State v. Martinez*, 2003 MT 65, ¶ 20, 314 Mont. 434, 67 P.3d 207; *Kaufman*, ¶ 14; *State v. Reynolds*, 272 Mont. 46, 49, 899 P.2d 540, 542 (1995); *United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 694-95 (1981).[4] A law enforcement traffic stop is a constitutional seizure subject to the protections of the Fourth Amendment and Montana

---

[3] A constitutional "search" is the "use of some means of" examining or gathering evidence "which infringes upon a person's reasonable expectation of privacy." *State v. Carlson*, 198 Mont. 113, 119, 644 P.2d 498, 501 (1982); *accord Smith v. Maryland*, 442 U.S. 735, 739-40, 99 S. Ct. 2577, 2579-80 (1979). A search infringes upon an individual's right to privacy while a seizure "deprives the individual of dominion over his or her person or property." *State v. Loh*, 275 Mont. 460, 468, 914 P.2d 592, 597 (1996) (quoting *Horton v. California*, 496 U.S. 128, 133, 110 S. Ct. 2301, 2306 (1990)); *accord State v. Scheetz*, 286 Mont. 41, 46, 950 P.2d 722, 724 (1997) (government infringement of a reasonable expectation of privacy constitutes a search). No search or seizure occurs absent government infringement of a reasonable expectation of privacy. *Scheetz*, 286 Mont. at 46, 950 P.2d at 724.

[4] *See also* § 45-2-101(73), MCA (defining a "stop" as "the temporary detention of a person that results when a peace officer orders the person to remain in the peace officer's presence").

Constitution, Article II, section 11. *State v. Jarman*, 1998 MT 277, ¶ 9, 291 Mont. 391, 967 P.2d 1099.

¶16    In this case, the District Court concluded, and the State does not contest, that the officers constitutionally seized Hoover at the time that they converged on foot on both sides of his parked vehicle, shined a flashlight into the open passenger window, and announced their presence as law enforcement officers. We thus confine our review to the initial and continued constitutional validity of the seizure and escalating investigation that ultimately resulted in Hoover's arrest, which then resulted in an otherwise lawful search incident to arrest and the discovery of his possession of illegal drug paraphernalia.

¶17    As a limited exception to the warrant requirement, a law enforcement officer may stop and temporarily detain a person for investigative purposes without probable cause for an arrest if, based on *specific and articuable facts known to the officer*, including rational inferences therefrom based on the officer's training and experience, the officer has an objectively reasonable, particularized suspicion that the person is engaged, or about to engage, in criminal activity. *State v. Elison*, 2000 MT 288, ¶ 15, 302 Mont. 228, 14 P.3d 456; *Roberts*, ¶ 12; *Reynolds*, 272 Mont. at 49-50, 899 P.2d at 542; *State v. Gopher*, 193 Mont. 189, 193-94, 631 P.2d 293, 295-96 (1981); *Cortez*, 449 U.S. at 417-18, 101 S. Ct. at 694-95; *Terry*, 392 U.S. at 16-19, 88 S. Ct. at 1877-79. Relevant considerations include the quantity, substance, quality, and degree of reliability of information known to the officer. *State v. Pratt*, 286 Mont. 156, 161, 951 P.2d 37, 40 (1997); *Alabama v. White*, 496

10

U.S. 325, 330, 110 S. Ct. 2412, 2416 (1990).[5] In 1991, the Legislature codified the Fourth Amendment particularized suspicion standard articulated in *Terry*, *Cortez*, and *Gopher*, to wit:

> In order to obtain or verify an account of the person's presence or conduct or to determine whether to arrest the person, a peace officer may stop any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense.

Section 46-5-401(1), MCA (1991 Mont. Laws 3027). *See also State v. Bar-Jonah*, 2004 MT 344, ¶ 42, 324 Mont. 278, 102 P.3d 1229 (noting codification of constitutional principles). The question of whether an officer had a particularized suspicion of criminal activity is a question of fact under the totality of circumstances, but the related question of whether the circumstances indicated activity that was illegal is a question of law. *Kaufman*, ¶ 11; *Cortez*, 449 U.S. at 417-18, 101 S. Ct. at 695.

¶18 The particularized suspicion standard does not require that an officer be certain, or even ultimately correct, that a person is engaged in criminal activity. *See State v. Thomas*, 2008 MT 206, ¶ 10, 344 Mont. 150, 186 P.3d 864; *State v. Henderson*, 1998 MT 233, ¶ 12, 291 Mont. 77, 966 P.2d 137, *Gopher*, 193 Mont. at 192, 631 P.2d at 295; *Cortez*, 449 U.S. at 418, 101 S. Ct. at 695. However, particularized suspicion requires more than mere generalized suspicion or an undeveloped hunch of criminal activity. *Illinois v. Wardlow*, 528 U.S. 119, 123-24, 120 S. Ct. 673, 676 (2000); *Terry*, 392 U.S. at 27, 88 S. Ct. at 1883.

---

[5] Upon challenge in a criminal proceeding, the State has the burden of proving that an officer had an objectively reasonable, particularized suspicion of criminal activity. *State v. Waite*, 2006 MT 216, ¶ 11, 333 Mont. 365, 143 P.3d 116; *State v. Angeline*, 1998 MT 139, ¶ 22, 289 Mont. 222, 961 P.2d 1251; *Gopher*, 193 Mont. at 194, 631 P.2d at 296.

*See also State v. Strom*, 2014 MT 234, ¶¶ 14-17, 376 Mont. 277, 333 P.3d 218 (daytime observation of occupied vehicle legally parked alone in public-use area near oft-vandalized war memorial insufficient for particularized suspicion of criminal activity); *Jarman*, ¶¶ 14-15 (mere presence in phone booth in high crime area on cold night insufficient particularized suspicion of criminal activity); *Reynolds*, 272 Mont. at 49-51, 899 P.2d at 542-43  (mere suspicion of "possible" traffic violation "combined with no other objective data" insufficient to justify investigatory stop); *Brown v. Texas*, 443 U.S. 47, 50-53, 99 S. Ct. 2637, 2640-41 (1979) (generalized observation that person looked suspicious in "neighborhood frequented by drug users" insufficient to justify investigative stop).

¶19    Here, Sgt. Meredith, a highly experienced officer on patrol in a commercial area, reasonably took note of an occupied, unlit vehicle parked late at night in the dark in a relatively secluded location near the back of a private mini-storage complex off of a busy highway.   Under these circumstances and based on his extensive law enforcement experience, Meredith certainly articulated a reasonable suspicion that an illegal break-in *might possibly* be in progress, thus warranting additional investigation in the performance of his official duty.  But, without observation or knowledge of additional facts, this initial suspicion was, as yet, no more than an undeveloped, *generalized* suspicion of criminal activity.   For this undeveloped suspicion to ripen into an objectively reasonable, particularized suspicion of criminal activity, the officers needed additional "specific and articuable facts" indicating that the occupants of the vehicle had committed, were committing, or were about to commit a specific criminal offense.  Section 46-5-401(1),

12

MCA; *Elison*, ¶ 15; *Roberts*, ¶ 12; *Reynolds*, 272 Mont. at 49-50, 899 P.2d at 542; *Gopher*, 193 Mont. at 193-94, 631 P.2d at 295-96; *Cortez*, 449 U.S. at 417-18, 101 S. Ct. at 694-95; *Terry*, 392 U.S. at 16-19, 88 S. Ct. at 1877-79.

¶20    The quantum or quality of information available to the officers in this case did not significantly increase or improve as they walked up to the parked vehicle from the rear. Prior to shining a flashlight into the cab through the open passenger window, the officers had still observed no more than a legally parked vehicle, non-specific movement in the cab, two people sitting apart in the front seats, the passenger side window down, and the driver looking down toward his lap or the steering wheel.  However reasonable as far as it went, Sgt. Meredith's general awareness that people typically engage in illegal drug use in secluded places was not further supported by any articulation of a more specific observation, sound, odor, or other evidence, information, or circumstance particularly indicative of illegal drug use, much less a storage unit break-in.  The officers' initial generalized suspicions simply did not ripen into any articuable particularized suspicion of a break-in or illegal drug use.  Despite ample opportunity for further surveillance or other efforts to at least attempt to develop additional facts sufficient for a particularized suspicion of criminal activity, the officers jumped the gun and prematurely set out to effect a constitutional seizure as the investigative means to confirm or dispel their as-yet only generalized suspicion of criminal activity.

¶21    The State attempts to favorably compare the facts of this case to those in *State v. Rodriguez*, 2011 MT 36, 359 Mont. 281, 248 P.3d 850.  In *Rodriguez*, two sheriff's

deputies were on patrol in a commercial area in Missoula when they noticed an unlit pickup slowly rolling though the parking lot of a recreational vehicle dealership around midnight. *Rodriguez*, ¶ 3. The dealership was not open for business and maintained "large quantities of expensive merchandise" onsite. *Rodriguez*, ¶ 3. The officer specifically articulated that he knew from experience that business burglaries typically occur at night, vehicles were typically never present in the parking lot of that particular business at night, and the vehicle was creeping along very slowly without lights, similar to a vehicle casing a closed business in advance of a burglary. *Rodriguez*, ¶¶ 3, 13, and 19. Under those circumstances, we held that the officers had sufficient particularized suspicion that the occupant of the vehicle was about to commit a burglary. *Rodriguez*, ¶¶ 13 and 19.

¶22 Here, unlike in *Rodriguez*, the mini-storage complex at issue was not closed for business. Though a business not typically frequented by renters around midnight, the complex was nonetheless an ungated, self-service operation, open to the public around the clock for that purpose. Moreover, in *Rodriguez*, the officer articulated specific conduct that, under the totality of the circumstances based on the officer's training and experience, was particularly indicative of specific criminal activity, i.e., casing a closed business in advance of a burglary. Here, though he articulated circumstances *generally conducive* to the commission of a break-in or illegal drug use, Sgt. Meredith did not further articulate any specific conduct or circumstance which, in context of his articulated generalized suspicion, was particularly indicative of an imminent break-in or illegal drug use. *Rodriguez* is not sufficiently analogous and, thus, factually distinguishable here.

14

¶23 Glossing over the manifest absence of any articulation of specific facts sufficient to further develop the officers' initial suspicions of a possible break-in or illegal drug use beyond mere generalized suspicion or a hunch, the State asserts that the subsequent observation of Hoover masturbating in the presence of a female in a secluded area justified additional intrusion to dispel a new or broadened suspicion of possible nonconsensual sexual activity, i.e., sexual intercourse without consent or indecent exposure. We certainly recognize that, based on additional information developed during the lawful duration and scope of an initial investigative stop, new or broader particularized suspicion of criminal activity may develop and thus permissibly expand the duration and scope of the stop beyond its initial purpose. *State v. Case,* 2007 MT 161, ¶ 34, 338 Mont. 87, 162 P.3d 849; *State v. Carlson,* 2000 MT 320, ¶ 21, 302 Mont. 508, 15 P.3d 893; *Hulse v. State,* 1998 MT 108, ¶¶ 40-42, 289 Mont. 1, 961 P.2d 108; *State v. Sharp,* 217 Mont. 40, 46, 702 P.2d 959, 963 (1985). We further recognize that, within the framework of constitutional reasonableness, a compelling government interest in "effective law enforcement" demands that officers in the field have "some latitude" to reach, follow up on, and confirm or dispel initial suspicions of criminal activity. *Sharp,* 217 Mont. at 47, 702 P.2d at 963; *see also State v. Seaman,* 2005 MT 307, ¶ 29, 329 Mont. 429, 124 P.3d 1137 (citing *Sharp* in community caretaker context). However, an investigative stop simply cannot lawfully ripen or escalate into new or broader particularized suspicion of criminal activity unless sufficient particularized suspicion of criminal activity exists to justify a stop in the first place and then continues to exist prior to the development of the additional information on

15

which an officer relies to prolong and expand its scope. *See Hulse*, ¶ 40-42 (escalating suspicion must arise from initial lawful stop); § 46-5-403, MCA (investigative stop "may not last longer than is necessary to effectuate the purpose of the stop").[6]

¶24 In *State v. Graham*, 2007 MT 358, 340 Mont. 366, 175 P.3d 885, a Yellowstone County sheriff's deputy was on patrol during daylight hours on a county road on the outskirts of Billings when she saw a pickup legally parked on an unpaved pullout located along and in plain view of the road. *Graham*, ¶ 2. Present in the pickup were two adults, a man and a woman later determined to be common law spouses. *Graham*, ¶ 2. Because the deputy did not usually see vehicles parked in that area, she decided to investigate further to determine whether the couple had mechanical problems. *Graham*, ¶ 2. As she drove by on the road, the deputy initially saw the fully clothed couple kissing passionately in the pickup and then saw the female attempt "to mount" the male. *Graham*, ¶ 3. She then circled back, activated her emergency top lights, pulled in behind the parked pickup, and approached on foot to "discourage . . . their inappropriate behavior" and "move them along." *Graham*, ¶ 3 (internal quotation marks omitted). Though the deputy "surmised"

---

[6] Section 46-5-403, MCA, is a 1991 codification of Fourth Amendment principles enunciated in *United States v. Sharpe*, 470 U.S. 675, 686, 105 S. Ct. 1568, 1575 (1985) (police must act diligently to quickly confirm or dispel predicate suspicion for an investigative stop); *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325-26 (1983) (duration and scope of investigative stop "must be carefully tailored to its underlying justification" and may not exceed what is reasonably "necessary to effectuate" its initial purpose); and *Terry*, 392 U.S. at 17-20, 88 S. Ct. at 1878-79 (warrantless investigative seizure and search reasonable only if based on particularized suspicion of criminal activity and the ensuing investigative detention is "strictly tied" and "reasonably related in scope" to the initial justification). *See also Carlson*, ¶ 21 (citing § 46-5-403, MCA, and *Royer*, 460 U.S. at 500, 103 S. Ct. at 1325).

that various violations of law could possibly occur in that scenario, "she observed none" prior to stopping and approaching the vehicle on foot. *Graham*, ¶ 16.

¶25 As she walked up to the vehicle, the deputy observed "a cold sweaty beer can outside the driver's door" and then saw through the window for the first time that the female's "pants were undone" and that the male's pants "were partly pulled down his legs, with his waistband underneath his bottom." *Graham*, ¶ 4. When the deputy asked what they were doing, the couple replied that they were "just kissing." *Graham*, ¶ 4. The deputy then asked them for identification and, while speaking with them, noticed an alcoholic odor on the male's breath. *Graham*, ¶ 4. Further questioning led to field sobriety testing and, ultimately, the male's arrest and conviction for driving under the influence. *Graham*, ¶ 4.

¶26 On appeal, the State argued that the deputy had sufficient particularized suspicion to justify the initial stop based on the possibility of "indecent exposure, sexual assault, sexual intercourse without consent, or sexual abuse of a child." *Graham*, ¶¶ 18-19. Noting that the deputy saw no particularized indication of any of those offenses, we affirmed the district court's ruling that she lacked sufficient particularized suspicion of criminal activity to justify the stop. *Graham*, ¶¶ 16-19. We noted that "[a]ny particularized suspicion" arose "only after" the deputy seized the couple and that any post-seizure observations "could not form a basis for particularized suspicion justifying the seizure in the first place." *Graham*, ¶ 20.

¶27 In *Kaufman*, after observing a vehicle with unequal tail light brightness at night on Interstate 90, a sheriff's deputy stopped the vehicle on suspicion of violation of

17

§ 61-9-204(1), MCA (requirement for two properly functioning tail lights). *Kaufman*, ¶¶ 6-7 and 16-19. The deputy had earlier followed the vehicle for several miles after observing a number of other suspicious circumstances.[7] *Kaufman*, ¶¶ 6-7. However, as the vehicle pulled over, the deputy saw that its tail and brake lights were in fact functioning properly. *Kaufman*, ¶ 8. Instead of breaking off the encounter, the officer completed the stop, approached on foot, and advised the driver that he stopped him for what appeared to an equipment violation. *Kaufman*, ¶ 8. The deputy then advised that it was no "big deal" but recommended that the driver have his brake lights checked. *Kaufman*, ¶ 8. The deputy then asked for the driver's license and vehicle registration, questioned the driver "about the car's ownership," and inquired about the occupants' "reasons for traveling on the Interstate that night." *Kaufman*, ¶ 8. The extended detention and questioning ultimately led to the discovery of two ounces of methamphetamine and the occupants' arrests. *Kaufman*, ¶ 2. On appeal, we reversed the district court's denial of the defendants' motions to suppress, holding that any reasonable suspicion that the officer "may have had that the lighting system was malfunctioning" completely evaporated "prior to the actual stop." *Kaufman*, ¶ 20. We concluded that, since the officer no longer had any particularized suspicion of criminal activity "to justify further investigation by the time" he stopped the vehicle, no

---

[7] The officer testified that he first became suspicious when he earlier saw that the occupants were 20-30 years old, ran a vehicle records check that indicated that the registered owner was a 74-year-old man, and saw one of the occupants conspicuously refused to make eye contact with him when he looked directly at her as he drove by. *Kaufman*, ¶ 5. While subsequently following the vehicle for several miles, he further observed it moving at a slow rate of speed, swerve over the fog line, and drive on the painted center line. *Kaufman*, ¶ 6.

legal basis existed for further detention and questioning about its ownership or the occupants' reasons for being on the road that night.[8] *Kaufman*, ¶ 25.

¶28 The foundation of the State's cascading theory of particularized suspicion is similarly unsound here. Before the four uniformed officers appeared out of the dark and seized Hoover and his companion, they had no more than an undeveloped generalized suspicion or hunch of a possible break-in or illegal drug activity. As in *Kaufman* and *Graham*, even that initial generalized suspicion instantly evaporated the moment they shined a flashlight through the open passenger window and clearly saw exactly what Hoover and his companion were doing and no particularized indication of a possible break-in or illegal drug use. With their initial asserted justification gone, the officers neither saw nor articulated any particularized indication of anything other than lawful sexual activity between consenting adults. Reasonable or not, the officers' belief that adults generally do not engage in consensual sexual activity in vehicles falls far short of what is necessary for an objectively reasonable, particularized suspicion of illegal sexual activity. As in *Graham* and *Kaufman*, the officers' post-seizure observations could not in any event form a lawful basis for particularized suspicion justifying the stop in the first place. Based on our independent review of the record, we hold that the Justice Court's ultimate finding that the officers had an objectively reasonable particularized suspicion that

---

[8] *See* similarly, *Martinez*, ¶ 74 (lawful duration and scope of an investigative stop based on suspicion of expired temporary registration sticker ended when officer stopped and walk-up to vehicle, read the sticker, and saw that temporary registration was still valid prior to contacting occupants).

Hoover was engaged, or about to engage in, a storage unit break-in, illegal drug use, or nonconsensual sexual activity was clearly erroneous as a matter of fact.

**CONCLUSION**

¶29 The Fourth Amendment "protects people, not places." *Terry*, 392 U.S. at 9, 88 S. Ct. at 1873 (quoting *Katz*, 389 U.S. at 351, 88 S. Ct. at 511). The right to be free from unreasonable searches and seizures is an "inestimable right of personal security [that] belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs." *Terry*, 392 U.S. at 8-9, 88 S. Ct. at 1873. The Fourth Amendment protects people "from unreasonable governmental intrusion" *wherever* they may have a "reasonable expectation of privacy." *Terry*, 392 U.S. at 9, 88 S. Ct. at 1873 (citing *Katz*, 389 U.S. at 351, 88 S. Ct. at 511); *accord Reynolds*, 272 Mont. at 49, 899 P.2d at 542-43. Montana Constitution Article II, sections 10 and 11, even more explicitly protect Montanans from government intrusion wherever they have a reasonable expectation of privacy. *E.g. Hardaway*, ¶¶ 31-34 (Mont. Const. art. II, section 10, right to privacy "is the cornerstone" of the section 11 right to be free from unreasonable searches and seizures). "No right is held more sacred" or should be more carefully guarded "than the right of every individual to the possession and control of his own person, free from all [government] restraint or interference" except as permitted by "clear and unquestionable authority of law." *Terry*, 392 U.S. at 8-9, 88 S. Ct. at 1873.

¶30 The State does not contest on appeal that Hoover had a reasonable expectation of privacy or that the officers constitutionally seized him when they converged on his pickup

20

from the dark, shined a flashlight into the open passenger side window, and began asking questions. On the limited evidentiary record in this case, the officers had no more than a generalized suspicion that Hoover might possibly be engaged, or about to engage, in criminal activity. In the manifest absence of more specific and articulable facts and law enforcement inferences, the Justice Court erroneously concluded that the officers had an objectively reasonable particularized suspicion that Hoover had committed, was committing, or was about to commit a criminal offense. We hold that the Justice Court erroneously denied Hoover's motion to suppress evidence obtained subsequent to his seizure. Hoover's conviction on the offense of Criminal Possession of Drug Paraphernalia, a misdemeanor in violation of § 45-10-103, MCA, is hereby reversed.

/S/ DIRK M. SANDEFUR

We concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ JAMES JEREMIAH SHEA

Justice Laurie McKinnon, dissenting.

¶31 I dissent from the Court's decision that there was no particularized suspicion to approach Hoover's vehicle and conduct an investigatory stop. In my opinion, *Rodriguez* is not distinguishable from the instant case and the Court's reliance on *Graham*, where police did not suspect unlawful activity, and *Kaufman*, which involved an extended detention, is misplaced. Pivotal to the analysis is Hoover's concession that he was "seized"

21

by law enforcement upon their initial contact.[1]  Thus, the only issue to resolve is whether police had particularized suspicion of unlawful activity—here, breaking and entering storage units and/or illegal drug use—*at the time police announced their presence to Hoover*.

¶32    The Court does not conclude that any of the Justice Court's findings of fact are clearly erroneous.  Those facts, which are undisputed, establish that Sgt. Meredith is a well-seasoned police officer with 18 years of patrol duty.  On August 2, 2013, at around midnight, he was on a swing shift and patrolling area businesses and parking lots in the vicinity of AAA Mini Storage.  The storage compartments are arranged in rows and do not have security, a gate, or a fence.  Also, there are no immediate businesses or homes around AAA Mini Storage and the storage complex is otherwise remote and has no lighting.  During the course of Sgt. Meredith's experience and duties as a patrol officer, he is aware that storage units in the area are frequently broken into and their contents stolen.  Sgt. Meredith is also aware that illegal drug activity takes place in vehicles parked in remote areas, at night.

¶33    On the night in question, Sgt. Meredith observed a truck parked *between* rows of the storage units at AAA Mini Storage with the vehicle's lights off.  Based on the truck's location in relation to the storage units, the time of night, and his knowledge of criminal activity occurring at storage units, Sgt. Meredith called for backup in order to investigate

---

[1]  Hence, the District Court, the Honorable Katherine R. Curtis presiding, did not review any facts following Sgt. Meredith announcing his presence and shining his flashlight into the cab of the truck.

his suspicions that unlawful criminal activity might be taking place, i.e. breaking and entering of the storage units. Sgt. Meredith and other officers approached Hoover's truck on foot. Approximately 15 yards away from the vehicle, Sgt. Meredith discerned that there were two occupants in the truck who were seated apart: one in the driver's seat and the other in the passenger's seat. The driver was moving his hands and was "concentrating" on something in his lap or in the area of the steering wheel. Sgt. Meredith testified he was now concerned the driver was "loading up" a marijuana bowl or a syringe to inject meth or another illegal drug. Sgt. Meredith announced his presence and shined his flashlight into the cab of the vehicle. Hoover was in the driver's seat and a female was in the passenger's seat. This is the point police made initial contact with Hoover's truck. Accordingly, due to Hoover's concession, any other information gathered by police following this initial contact is irrelevant and not appropriate for our analysis.

¶34 The above facts are not in dispute and the analysis is straightforward. Sgt. Meredith is authorized to conduct an investigatory stop if he has (1) objective data from which an experienced officer can make certain inferences; and (2) a resulting particularized suspicion that the occupant of the vehicle is engaged in wrongdoing. *Rodriguez*, ¶ 17; *State v. Hilgendorf*, 2009 MT 158, ¶ 13, 350 Mont. 412, 208 P.3d 401. "Whether particularized suspicion exists is evaluated under the totality of the circumstances confronting the officer at the time of the stop, and requires consideration of the quantity or content of the information available to the officer and the quality or degree of reliability of that information." *City of Missoula v. Moore*, 2011 MT 61, ¶ 16, 360 Mont. 22, 251 P.3d 679.

23

From this data, "a trained officer draws inferences and makes deductions--inferences and deductions that might well elude an untrained person." *Cortez*, 449 U.S. at 418, 101 S. Ct. at 695.

¶35 In *Rodriguez*, the following facts were set forth by this Court and found to establish particularized suspicion:

> Deputy Stineford observed Rodriguez's vehicle located outside Kurt's Polaris at 11:30 p.m., well after the business had closed. He testified that he observed Rodriguez's vehicle, with its headlights off, rolling slowly through the parking lot of a business that contained a significant amount of expensive inventory. Deputy Stineford testified that his experience taught him that burglaries of businesses occur at night and that no vehicles were typically present in the business's parking lot at night. These objective and articulable observations reasonably led Deputy Stineford to possess the requisite particularized suspicion that Rodriguez was casing Kurt's Polaris to commit burglary. The District Court did not err in concluding that Deputy Stineford was justified in conducting an investigative stop of Rodriguez.

*Rodriguez*, ¶ 19. The Court attempts to distinguish *Rodriguez* by observing that Rodriguez's vehicle was "creeping" along and casing a business. Opinion, ¶ 21. The Court states that, here, "the couple" parked in a secluded spot to "engage in consensual intimacy on a warm summer night." Opinion, ¶ 2. The Court's attempt to distinguish *Rodriguez*, however, cannot be supported by either the facts here or in *Rodriguez*.

¶36 In the instant proceeding, the *objective* data consists of the following: Hoover purposely secluded and isolated his vehicle; he turned off his headlights and any other vehicle illumination in order to avoid detection; he parked between rows of the storage units to further seclude himself and avoid detection; it was dark and late at night; Hoover chose to isolate himself in a private business area where people pay to store their

belongings; and Sgt. Meredith testified that, in his experience, breaking into storage units is a frequent occurrence in the area. In addition, Sgt. Meredith testified that as he approached Hoover's vehicle he observed movement consistent with the ingestion of illegal drugs, either loading a pipe or filling a syringe. Based on this objective data, an experienced officer such as Sgt. Meredith could reasonably infer that Hoover was involved in breaking into a storage unit or ingesting illegal drugs. I respectfully disagree with the Court's conclusion that *Rodriguez* is "not sufficiently analogous" and is "factually distinguishable here." Opinion, ¶ 22. The Court appears to distinguish *Rodriguez* because the vehicle was "creeping" along. The Court fails, however, to consider the totality of the circumstances and the reasonable inferences that Sgt. Meredith, a trained police officer, may draw.

¶37 In *Hilgendorf* we found the following facts were sufficient to establish particularized suspicion:

> Hilgendorf does not contest that his car was parked near a business at 2:00 a.m., when all of the area businesses were closed, that the area was known for its thefts from and burglaries of the businesses, or that he quickly left upon the second approach of the police vehicle. . . . Romero also observed that both Hilgendorf and his passenger were moving around inside the vehicle as if trying to conceal something in the vehicle. Denying that he initiated the stop for a traffic violation, Romero testified the stop was made because the occupants "were busy moving around inside the vehicle" and that "the actions they were taking, a normal person wouldn't be doing," leading to his conclusion that "I felt there could be something going on, like somebody committing a theft" and his decision to initiate a stop. These observations, combined with what Romero had initially observed, were objective data from which Romero could make inferences about the possibility of a crime and come to a resulting suspicion that a theft could be in progress.

*Hilgendorf*, ¶ 18. Our analysis in *Rodriguez* is consistent with *Hilgendorf* and stands in stark contrast to the Court's conclusion here that there was only "an undeveloped, generalized suspicion of criminal activity." Opinion, ¶ 19. Our analysis fails particularly when we draw such a conclusion after we have noted that "[u]nder these circumstances and based on his extensive law enforcement experience, Meredith certainly articulated a reasonable suspicion that an illegal break-in might possibly be in progress, thus warranting additional investigation in the performance of his duty." Opinion, ¶ 19. By approaching the parked vehicle, Sgt. Meredith was, in fact, conducting that additional investigation. That Sgt. Meredith's initial suspicions were subsequently dispelled through further investigation does not affect the objective data and reasonable inferences existing immediately prior to Sgt. Meredith's contact with Hoover. The Court appears to have difficulty with these important distinctions.

¶38    As another example, in *Brown v. State* this Court found there was particularized suspicion to justify an investigatory stop based on the following:

> At approximately 2:51 a.m. on June 10, 2007, Hill County Deputy Sheriff Stephen Martin observed a white Ford pickup "barely moving" along a public roadway with its lights on. As Deputy Martin watched, the pickup suddenly pulled over, came to a stop and shut off its lights. Concerned that the occupants of the pickup were experiencing problems, Martin pulled in behind it, exited his vehicle and approached the driver's side of the pickup.
> Brown, who was in the drivers' seat, was the only person in the pickup. Deputy Martin noted that no structures or other persons were in the immediate vicinity. When Brown rolled down his window, Deputy Martin immediately detected the odor of alcohol.

2009 MT 64, ¶¶ 3-4, 349 Mont. 408, 203 P.3d 842 (footnote omitted). We explained in *Brown* that "[t]he question is not whether any one of [defendant's] driving aberrations was

26

itself 'illegal' but rather, whether [the officer] could point to specific and articulable fact which, taken together with reasonable inferences from those facts, reasonably warrant the intrusion." *Brown*, ¶ 22 (citing *Clark v. State ex rel. Driver Improvement Bureau*, 2005 MT 65, ¶ 9, 326 Mont. 278, 103 P.3d 244). Further, "a peace officer's experience and training may be a factor in determining what sort of reasonable inferences he or she is entitled to make from his or her objective observations . . . ." *Brown*, ¶ 20. Here, although no single fact standing by itself established particularized suspicion of wrongdoing, Sgt. Meredith's considerable experience in patrol and awareness of burglaries of area storage units—in conjunction with Hoover's efforts to seclude himself late at night in a storage unit area—established particularized suspicion for further investigation.

¶39 Lastly, the Court attempts to draw support from *Graham* and *Kaufman*. In *Graham*, however, our decision turned on the deputy's failure to articulate *any* criminal activity for which the deputy was suspicious. In fact, we explained "it bears repeating that Officer Juhl herself did not approach the vehicle because she believed a crime was being committed, as § 46-5-401(1), MCA requires; she did so because she thought their behavior was 'inappropriate' and she wanted to 'move them along.'" *Graham*, ¶ 22. Noting that "the Legislature has not yet outlawed the type of conduct in which Graham and Strauser were engaging[,]" we held that "[i]t is not this Court's role to inject particularized suspicion when the officer, by her own admission, did not have it." *Graham*, ¶¶ 21-22. In contrast to *Graham*, Sgt. Meredith believed that breaking and entering storage units and/or illegal drug use—both unlawful activities—were potentially occurring. The Court confuses the

*Graham* extended detention analysis with the events occurring here. *See* Opinion, ¶ 28. Our statement that "[w]ith their initial asserted justification gone, the officers neither saw nor articulated any particularized indication of anything other than lawful sexual activity between consenting adults[]" demonstrates the confusion in our analysis, in light of Hoover's concession that he was seized once police initiated contact with his vehicle. Opinion, ¶ 28. What the officers learned after their initial contact with Hoover's vehicle is irrelevant to the analysis.

¶40    Similarly, in *Kaufman*, one tail lamp on Kaufman's vehicle emitted a significantly brighter light than the other. Initially, the deputy investigating believed the driver either might be applying the brakes and gas simultaneously or experiencing a lighting malfunction. However, after the officer signaled the driver to pull over, the officer noticed that the turn signals of the Kaufman's vehicle were, in fact, operating properly and both stop lamps were fully functional. We held that "any suspicion [the officer] may have had that the lighting system was malfunctioning was quelled completely prior to the actual stop." *Kaufman*, ¶ 20. Thus, law enforcement in *Kaufman* no longer suspected Kaufman of violating any traffic safety laws by the time Kaufman was pulled over on the highway. In the instant proceeding, however, Sgt. Meredith had not dispelled his suspicions of Hoover's involvement in wrongdoing prior to his contact with Hoover. Police did not dispel their suspicions of criminal activity—breaking and entering and/or using drugs— until after they had initiated contact. Hoover's concession that a seizure occurred at the

28

point of initial contact with police rendered any subsequent de-escalation of suspicious circumstances inappropriate for consideration by the Court.

¶41 In my opinion, the Court's description of the objective data Sgt. Meredith relied upon to draw reasonable inferences of criminal activity as "only" a "generalized" suspicion of wrongdoing does the citizens of this State a disservice, let alone being inconsistent with this Court's precedent. Citizens rely on the expertise of police to follow up on their particularized suspicions with investigations which dispel their suspicions and maintain the security of their communities. I disagree with the Court's conclusion that these facts and the inferences drawn therefrom did not warrant further investigation by police; that is, approaching the vehicle to inquire of Hoover what he was doing. This is exactly what Sgt. Meredith did.

¶42 I respectfully dissent from the Court's decision concluding otherwise.


/S/ LAURIE McKINNON