FILED

09/02/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 24-0402

DA 24-0402

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 193

STATE OF MONTANA,

Plaintiff and Appellee,

v.

ALISON BETH CARTER-BRUEGGEMAN,

Defendant and Appellant.

APPEAL FROM: District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DC-23-186
Honorable Jennifer B. Lint, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Mathew M. Stevenson, Stevenson Law Office, Missoula, Montana

For Appellee:

Austin Knudsen, Montana Attorney General, Brad Fjeldheim,
Assistant Attorney General, Helena, Montana

William E. Fulbright, Ravalli County Attorney, David Lakin, Deputy
County Attorney, Hamilton, Montana

Submitted on Briefs: April 2, 2025

Decided: September 2, 2025

Filed:

_____
Clerk

Chief Justice Cory J. Swanson delivered the Opinion of the Court.

¶1    Alison Beth Carter-Brueggeman (Brueggeman) pleaded guilty to Felony Criminal Possession of Dangerous Drugs and Misdemeanor Criminal Possession of Drug Paraphernalia. Brueggeman now appeals the District Court's denial of her Motion to Suppress the discovery of Methamphetamine in her purse. We reverse.

¶2    We restate the issue on appeal as follows:

*Whether the District Court correctly denied Brueggeman's Motion to Suppress.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3    On the evening of September 4, 2023, Ravalli County Deputy Sheriff Thomas Hsu pulled over Brueggeman for driving a car with expired registration. The traffic stop was not the result of a random encounter with a law enforcement officer.

¶4    Earlier that evening, the Ravalli County Dispatch received a call for service providing drug intelligence about a certain residence. Another Deputy Sheriff spoke to the caller, and the information was relayed to Deputy Hsu. The caller reported activity at a certain residence on Moccasin Trail in Victor, Montana; the caller was not identified by name but spoke with personal knowledge of the events. The caller stated no vehicles had been at the residence for a few days, and suddenly multiple people in multiple vehicles showed up, then some departed while others remained on the scene. The officers were aware of a report from July 2023 associated with the same residence, which resulted in two arrests for drug activity and numerous follow-up calls.

¶5    Around the same time officers were speaking with the citizen informant, Deputy Hsu received a call from off-duty Montana Highway Patrol Trooper Andrew Barbera.

2

Deputy Hsu was aware Trooper Barbera had been trained in drug interdiction, and he was involved in local drug investigations. Trooper Barbera informed Deputy Hsu he saw Brueggeman driving a blue Toyota Tundra with Idaho license plates, and she had just departed the residence that the citizen informant separately reported. The Trooper also reported Brueggeman's vehicle had an expired license plate. Trooper Barbera followed the vehicle from Victor, but lost sight of it in Hamilton.

¶6 Deputy Hsu testified at the suppression hearing he knew the history of the residence at Moccasin Trail, he knew who Brueggeman was, and he considered the activity at the residence possibly indicative of drug activity, where a number of people meet up at a pre-designated time and place to exchange drugs. He testified based on his training and experience, "when someone who is suspected of distribution gets a new product, all of a sudden there's people or vehicles coming and leaving more so than usual."

¶7 Deputy Hsu drove toward Brueggeman's last known location and observed her traveling toward him on the two-lane Skalkaho Highway. As he went past the vehicle, he confirmed the Trooper's vehicle description and recognized Brueggeman as the driver. She waved at him as she drove past. Deputy Hsu turned around and initiated a traffic stop for the expired license plate, but he testified he also had suspicions she was involved in drug activity associated with the residence at Moccasin Trail.

¶8 As Deputy Hsu approached the vehicle, Brueggeman questioned the reason for the stop. When told she was pulled over for the expired registration, Brueggeman questioned how the Deputy knew they were expired. Deputy Hsu explained he "heard it from another . . . law enforcement official," and asked her for her registration. Brueggeman

3

maintained her skepticism and asked for more information. She explained the vehicle belongs to her husband's friend, who was in jail, and she was planning on selling the vehicle for the friend.

¶9 Deputy Hsu asked Brueggeman where she was coming from. She stated she was at a disabled friend's house, cleaning it for him. She told the Deputy the friend lived in Victor, but she did not remember the address or the name of the road. However, she accurately described the general location of the home. Brueggeman opined the Deputy was not asking her a "valid question." She stated she was heading home, and her children were waiting for her.

¶10 Brueggeman informed the Deputy she had been stopped previously by an officer, and had been informed the vehicle's registration was expired. Because it wasn't her vehicle, she had not paid to get it renewed. She also provided the Deputy with a form of financial assurance, which was unlike the type of proof of insurance he had previously seen. It required him to call in the vehicle to determine whether it was insured. As he departed the vehicle, the Deputy shone his flashlight into the tinted rear window to see what was in the back seat. He observed cleaning supplies, which was consistent with Brueggeman's statement she had been helping clean a friend's house.

¶11 Upon returning to Brueggeman's car ten minutes later, Deputy Hsu informed Brueggeman he was suspicious of criminal activity. Brueggeman replied she had not done anything wrong. She explained she was "helping an old man," and she was going home to sell her child's "dirt bike" to a person who was waiting at her house. Deputy Hsu asked Brueggeman why she did not know the address of her friend's house. Brueggeman said

4

they were friends for a couple of years, and she has been there a dozen times. The Deputy opined it was "weird [she has] been there multiple times but [she] do[es] not know the name of the road." Brueggeman did not address that suspicion, instead explaining she was alone at the house, and the friend was not even there. Deputy Hsu asked if she stopped anywhere after she left the friend's house, and Brueggeman said she stopped to get gas. The Deputy asked what route she used, and Brueggeman said she "actually did stop somewhere else," explaining she needed to purchase a "dirt bike part for [her] son" so she stopped at "Brian Golie's shop," then she got back on the highway until she was pulled over. She explained her son wanted to sell his motorcycle and was waiting at home for the mechanical part.

¶12    Deputy Hsu then asked if she was coming from "Moccasin Trail." Brueggeman nodded slightly and responded, "that might be it, it's possible." He asked if the house was at the end of the driveway on the left-hand side, and she responded "yes." Brueggeman then volunteered she heard stories about the house. Deputy Hsu asked what she had heard, and Brueggeman said the people who lived upstairs in her friend's house had mentioned drug activity and traffic stuff, because they had been engaged in those activities. She said they complained when too many vehicles came to the house because it draws unwanted attention.

¶13    The Deputy asked who had been there today. Brueggeman clarified her friend's apartment downstairs is separate from the upstairs. She said she was in the downstairs portion by herself, but the upstairs owners were there. She said arrivals included a couple of people in a vehicle she did not describe, then she said another man arrived on a Harley

5

motorcycle. She said she had also seen a vehicle at the gas station with its hood up, and that vehicle had been at the house. Brueggeman indicated some other people arrived at some point, but she did not know who they were or what they were doing.

¶14    Brueggeman confirmed to Deputy Hsu "there is nothing illegal in [the] vehicle." The Deputy listed various drugs, and she denied the presence of any of these drugs. When Deputy Hsu asked Brueggeman if she would consent to a search, Brueggeman denied consent, explaining she was not doing anything illegal and she was not doing drugs. The Deputy persisted, suggesting perhaps he could look through the vehicle to dispel his suspicion and it would not take long, but Brueggeman maintained her denial of consent. Deputy Hsu then asked Brueggeman for permission to search a bag in the car, which Brueggeman denied. As this conversation was occurring, Deputy Caltigirone arrived on the scene. Up to this point, Brueggeman questioned Deputy Hsu as to the basis for the stop, and she declined his repeated requests for consent to search.

¶15    At the conclusion of this interaction, Deputy Hsu informed Brueggeman he was seizing the vehicle. She asked why, and Deputy Hsu replied, "I have particularized suspicion the vehicle was involved in criminal activity." Brueggeman became indignant, repeatedly questioned the Deputy's basis for seizing the vehicle, and accused him of an "overreach of power." Deputy Hsu asked and then ordered her to step out of the vehicle. She declined, so he opened the door and Brueggeman argued with Deputy Hsu and Deputy Caltigirone. As Brueggeman was not responding to their request to exit the vehicle, the Deputies attempted to pull her out while she still had her seatbelt fastened, and she yelled at them to let her unbuckle. After she got out of the vehicle, she tried to reach into the

6

vehicle, and Deputy Caltigirone grabbed her and pulled her out of the vehicle again. She yelled, "excuse me!" and demanded he take his hands off her. Deputy Hsu shut the door of the vehicle and then Deputy Caltigirone let go of Brueggeman.

¶16 As the verbal altercation between Brueggeman and the two Deputies ensued, Deputy Hsu informed Brueggeman she was free to leave, and the vehicle was being seized. Deputy Hsu informed Brueggeman she may use her phone to have someone pick her up. Brueggeman called her brother for a ride. Brueggeman sought to retrieve her second bag, with her clothes, from the car. She asked the Deputy if he could search through the bag and then return it to her, and he declined. He added she was "really lucky" she got the purse out, implying the purse was meant to be seized along with the truck. Deputy Hsu asked Deputy Caltigirone to stand with Brueggeman while he stepped away to consult a detective on the phone regarding seizing the purse.

¶17 Five minutes later, Deputy Hsu returned to Brueggeman with her driver's license. He informed her the purse was seized, but Brueggeman refused to hand it over. Deputy Hsu attempted to take it and Brueggeman resisted. Brueggeman was restrained by Deputy Caltigirone while Deputy Hsu took her purse and placed it in her truck. Brueggeman accused the Deputies of injuring her and breaking a piece of jewelry on her wrist.

¶18 Brueggeman's brother arrived six minutes later. However, Brueggeman refused to leave the scene, saying she could stay because the Deputies told her she was free to go. Deputy Hsu repeatedly advised her to leave, and told her she could not wander around on the road. Instead, Brueggeman called the Ravalli County Dispatch and requested a supervisor. She again reiterated to Deputy Hsu that seizing the purse was a mistake, and

7

there is nothing there besides her makeup and her wallet. Brueggeman accused the Deputies of using excessive force to seize the purse. Eventually, Sergeant Liechty arrived, and Deputy Caltigirone left the scene. Brueggeman made multiple requests to retrieve her purse to the Sergeant, and filed a formal complaint against Deputy Hsu.

¶19 Brueggeman next explained the layout of the property on Moccasin Trail, saying the top and bottom portions of the home are separate, and "there were many people [on the property]." Deputy Hsu pointed out she initially stated she was alone, but now she was saying there were many people there. Deputy Hsu accused Brueggeman of changing her story. Brueggeman insisted she told the Deputy other vehicles had arrived at the residence. The Sergeant acquiesced to Brueggeman's request that she be allowed to take the motorcycle part from the vehicle and give it to her son. The officers refused to return the purse. Deputy Hsu applied for a search warrant, which was granted by the court. Inside the purse, the officers located a small amount of Methamphetamine and a pipe used to smoke it. No other drugs were located in the pickup or the other bags. Officers found a butane torch in the door pocket and cotton alcohol swabs in the center console.

¶20 In support of the search warrant, Deputy Hsu stated he suspected the vehicle was involved in criminal activity due to the informant's phone call alleging suspicious activity at the Moccasin Trail residence. Deputy Hsu stated this address was "the subject of suspected heavy drug activity." He summarized the traffic stop and highlighted the inconsistencies around Brueggeman not knowing the address of the house and her visit to Golie's Motorcycle shop. He noted Brian Golie, the motorcycle shop owner, had a "history of dangerous drug use." Additionally, Brueggeman had a history of "being arrested for

8

possession and distribution of dangerous drugs." The Deputy added, once he opened the door to remove Brueggeman from the vehicle, he noticed a butane torch in the door. Deputy Hsu supported his particularized suspicion based on: (1) sudden increased activity at the Moccasin Trail address; (2) his training indicated drug shipments "generate extra activity at the shipment location"; (3) his knowledge of Brueggeman's past history of drug possession; (4) her admission of being at the Moccasin Trail address; (5) her admission she was in the downstairs portion of the home, which was "inhabited by [people] who are also associated with dangerous drug activity"; (6) the vehicle belonging to someone who was on hold for federal charges; (7) Brueggeman stopping at Golie's motorcycle shop, who had a history of drug use; (8) Brueggeman's deflective behavior; (9) the butane torch in the door and used and unused cotton alcohol swabs in the center console, which could indicate drug use; and (10) Brueggeman being "hyper focused on her purse" and arguing to retain it, but then refusing to give consent to have it searched and then returned.

¶21 Brueggeman was charged with Felony Criminal Possession of Dangerous Drugs and Misdemeanor Criminal Possession of Drug Paraphernalia.[1] Brueggeman filed a Motion to Suppress and Brief in Support, seeking to suppress the evidence discovered in her purse. Brueggeman argued the stop was unlawfully extended, the seizure of her purse was unlawful, and the search warrant for her vehicle was not supported by probable cause.

¶22 On March 5, 2024, the District Court held an evidentiary hearing on the motion to suppress, where Deputy Hsu testified about the events leading up to the seizure, and the

---

[1] Brueggeman was not charged with Obstructing a Peace Officer, § 45-7-302, MCA, for her refusal to exit the vehicle or surrender her purse.

court reviewed Hsu's body camera video. In her Post-Evidentiary Hearing Brief in Supplement to Motion to Suppress, Brueggeman argued Deputy Hsu lacked probable cause to seize the vehicle or the purse, as the information she provided to Deputy Hsu, as well as his observations, should have dispelled suspicions of drug possession. Lastly, she argued any misleading or inaccurate information in the search warrant application should be excised, and the application should be reviewed de novo.

¶23 On May 9, 2024, the District Court denied Brueggeman's motion to suppress, holding Deputy Hsu had particularized suspicion to conduct a traffic stop and extend the scope and duration of the traffic stop to inquire into drug activity. The District Court further found probable cause to seize the vehicle:

> Deputy Hsu's observations of the facts and circumstances surrounding the traffic stop were sufficient to warrant a reasonable person to believe that the Defendant possessed illegal drugs in the vehicle she was driving. These facts and circumstances included: (1) the two separate calls Deputy Hsu received prior to the stop; (2) the Defendant's own statements that were consistent with the information provided in the calls; and (3) Deputy Hsu's personal knowledge of the ongoing investigation of the Moccasin Trail address and his training and experience regarding drug distribution in general.

The court also held when Deputy Hsu seized the vehicle, he seized the purse as well. Finally, the court held there was probable cause for a search warrant, and Brueggeman failed to meet her burden to prove statements in the application for the search warrant were false and should be excised.

¶24 On June 6, 2024, Brueggeman pleaded guilty to the two charged offenses pursuant to a plea agreement with the State. Brueggeman reserved her right to challenge the District

10

Court's order denying her motion to suppress. Brueggeman now appeals the denial of her motion to suppress.

## STANDARD OF REVIEW

¶25 We review a district court's denial of a motion to suppress evidence in a criminal case to determine whether the court's relevant findings of fact are clearly erroneous and whether it correctly interpreted and applied the applicable law to those facts. *State v. Rymal*, 2024 MT 277, ¶ 9, 419 Mont. 144, 559 P.3d 839. A district court's findings of fact are clearly erroneous when they are not supported by substantial evidence, the court misapprehended the effect of the evidence, or, upon our independent record review, we are firmly convinced the court was otherwise mistaken. *Rymal*, ¶ 9. Whether a district court correctly interpreted and applied the pertinent law to the facts at issue is a question of law subject to de novo review. *Rymal*, ¶ 9.

## DISCUSSION

¶26 *Whether the District Court correctly denied Brueggeman's Motion to Suppress.*

¶27 The Fourth Amendment to the United States Constitution and Article II, Section 11, of the Montana Constitution guarantee the right to be free from "unreasonable searches and seizures" of "persons, houses, papers, and effects." U.S. Const. Amend. IV; Mont. Const. art. II, § 11. Absent an exception, "government searches and seizures are unlawful . . . unless conducted in accordance with a judicial warrant issued on probable cause." *State v. Loberg*, 2024 MT 188, ¶ 10, 418 Mont. 38, 554 P.3d 698.

**Investigative Stop**

¶28    Temporary investigative stops, such as traffic stops, are seizures excepted from the warrant and probable cause requirements. *State v. Hunt*, 2025 MT 122, ¶ 24, 422 Mont. 322, 570 P.3d 567 (citation omitted). An officer may stop "any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense." *Hunt*, ¶ 24 (citation omitted). To find particularized suspicion, the State must show the existence of "objective data from which an experienced officer can make certain inferences and a resulting suspicion that the occupant of the vehicle is or has been engaged in wrongdoing." *Hunt*, ¶ 25 (citation omitted).

¶29    To determine the sufficiency of particularized suspicion, we look to the totality of the circumstances. *Hunt*, ¶ 25 (citation omitted). Particularized suspicion must be supported by "specific articulable information, considering the quantity, substance, quality, and degree of reliability of information known to the officer at the time." *Hunt*, ¶ 25 (quotation omitted). Inferences drawn from "the conduct of any law-abiding person cannot be the only bases for an Deputy's suspicion because the resulting suspicion is not particularized." *Hunt*, ¶ 26 (citation omitted).

> [W]e have observed the following facts or inferences could be drawn about virtually any law-abiding person: inconsistent statements concerning a person's conduct, presence, or plans; unusually nervous or defensive behavior when monitored, stopped, confronted, or questioned by police; traveling to or from an area generally known as a source, destination, or situs of/for illegal drugs or other illegal contraband or activity; or other legal or innocuous conduct, behavior, or possessions. Yet such conduct may give rise to particularized suspicion under the totality of the circumstances when made in conjunction with other specific indicia of criminal activity.

12

*Hunt*, ¶ 25 (internal citations omitted).

¶30 In this case, Brueggeman did not dispute Deputy Hsu had particularized suspicion to initiate the traffic stop for expired registration. She disputes the expanded inquiry into possible illegal drug activity beyond the Toyota Tundra's registration and insurance.

¶31 As we have previously held, merely "traveling to or from a city or area generally known as a source, destination, or situs of/for illegal drugs or other illegal contraband or activity," absent specific indicia of criminal activity, does not create particularized suspicion to warrant an extension of a stop. *Loberg*, ¶ 12. This holding is born out of our previous case, *State v. Fisher*, where a defendant was travelling in "an area in Billings that is known to police officers for its high crime rate." 2002 MT 335, ¶ 3, 313 Mont. 274, 60 P.3d 1004. An officer, who responded to a report of a firearms offense occurring in an alley, saw the defendant driving near the reported area. *Fisher*, ¶ 4. The officer pulled over the defendant's vehicle. *Fisher*, ¶ 4. After the defendant failed to provide his identification, the officer asked the defendant to leave his vehicle, patted the defendant down, and found drugs and drug paraphernalia. *Fisher*, ¶ 4. The officer justified his particularized suspicion for the *Terry* stop, in part, on the stop occurring in a "high-crime area." *Fisher*, ¶ 15. On that particular justification, we held the officer did not have a particularized suspicion to conduct the *Terry* stop because there were no acts of evasion or other indicia of criminal activity. *Fisher*, ¶ 19.

¶32 In *State v. McMaster*, an officer observed the defendant exchange a package at a gas station with a third party, and requested a second officer follow the defendant's car. 2008 MT 294, ¶ 4, 345 Mont. 408, 191 P.3d 443. As the defendant continued his drive,

13

the second officer noticed the defendant driving erratically and committing traffic violations. *McMaster*, ¶ 6. After the officer pulled the defendant's car over to the side, he observed McMaster reaching behind the seat, and there was a knife in easy reach of the driver in the door pocket. *McMaster*, ¶ 7. For safety, the officer asked the defendant to exit the vehicle, at which point he performed a pat-down and found drugs and a knife in the defendant's pocket. *McMaster*, ¶ 7. On appeal, the defendant argued the officers lacked particularized suspicion because "particularized suspicion cannot result from 'general information and observed behavior' that is not illegal, but that officers may view as suspicious." *McMaster*, ¶ 14. The defendant noted "the box transferred at the Town Pump could have contained a gift, rather than drugs . . . , [and] the Town Pump is . . . a place where people gather to purchase gas, convenience items, and gamble." *McMaster*, ¶ 14 (internal quotations omitted). We rejected the defendant's arguments because the officer observed other indicia of criminal activity. *See McMaster*, ¶ 18. Specifically, the officer relied on the "observations at the Conrad Town Pump, [his] knowledge of [the defendant's status] as a drug-dealer, his personal observations of [the defendant's] erratic driving, and his knowledge that the Town Pump was a location known for drug deals." *McMaster*, ¶ 18. Thus, the totality of the circumstances showed the officer had particularized suspicion to initiate the stop. *McMaster*, ¶ 23.

¶33 On the other hand, in *State v. Loberg*, an officer lacked particularized suspicion for a *Terry* stop. *Loberg*, ¶ 25. There, an officer conducted a traffic stop after observing the defendant leave a casino. *Loberg*, ¶ 3. The officer justified the stop in part on his presence at the "Magic Diamond Casino, which is a business often used for the drug trade." *Loberg*,

14

¶ 19. We concluded this was inadequate to create specific indicia of criminal activity to justify particularized suspicion. *Loberg*, ¶ 19. "That fact combined with a collection of other totally innocent or innocuous facts does not give an officer particularized suspicion to subject everyone leaving a casino to a canine sniff." *Loberg*, ¶ 19 (citation omitted).

¶34 Most recently, in *State v. Hunt*, we held an officer had particularized suspicion to conduct a stop. *Hunt*, ¶ 34. There, the officer observed an unregistered vehicle parked in front of an apartment associated with heavy use of methamphetamine. *Hunt*, ¶ 3. Thirty minutes later, he observed the unregistered vehicle traveling down the street. *Hunt*, ¶ 4. The officer initiated a stop for the registration and then proceeded to extend the stop to investigate possible drug related criminal activity. *Hunt*, ¶ 7. We concluded the detective had additional specific indicia of drug activity to inquire into possible criminal activity and conduct a canine search. *Hunt*, ¶ 34. Specifically, we distinguished *Hunt* from *Loberg* because in *Hunt*, the apartment was not generally open to the public, unlike a casino in *Loberg*, and the evidence of drug activity was specific to Hunt's apartment. *Hunt*, ¶ 33 (citing *Loberg*, ¶ 19).

¶35 Here, the suspect was reported leaving a private residence known for drug activity. This distinguishes the Moccasin Trail location from *Loberg*, where the location was a casino open to the public, or from *Fisher*, where the location was a high crime area of Billings. Like *Hunt*, this case involves a person leaving a residence with a much smaller universe of potential visitors, thereby particularizing the location of suspected criminal activity. Additionally, there was unusual activity at the location earlier in the day, suggesting *currently ongoing* criminal activity.

15

¶36 Deputy Hsu did not observe Brueggeman at the Moccasin Trail residence. Instead, he relied on an informant. An officer may rely on a third-party's report to develop particularized suspicion. We developed the three factor *Pratt* test to evaluate sufficiency of a third-party's report, looking to whether: (1) the informant identified herself to the authorities; (2) the informant's report is based on personal observation; and (3) the officer's observations corroborate the informant's information. *State v. Foster*, 2017 MT 118, ¶ 11, 387 Mont. 402, 394 P.3d 916 (citing *State v. Pratt*, 286 Mont. 156, 164–65, 951 P.2d 37, 42–43 (1997)). An informant's tip may be considered more reliable where the citizen identifies himself or herself, but the informant is not required to self-identify. *Foster*, ¶ 13 (citation omitted).

¶37 In *State v. Brander*, an anonymous caller informed the authorities the defendant was driving drunk. 2004 MT 150, ¶ 2, 321 Mont. 484, 92 P.3d 1173. Dispatch relayed this information to officers, who arrived at the scene and identified a vehicle matching the description given by the anonymous caller. *Brander*, ¶ 2. The officers observed the vehicle driving slowly and swerving across the road. *Brander*, ¶ 2. They initiated a stop, discovered the defendant was inebriated, and arrested the defendant. *Brander*, ¶ 2. On appeal, the defendant argued the police lacked particularized suspicion because the anonymous caller's report did not meet the *Pratt* factors. *Brander*, ¶ 5. We held the officers had particularized suspicion because the officers followed the defendant for several miles and relied on their own observations in addition to the call. *Brander*, ¶ 5.

¶38    Deputy Hsu relied on information from two sources, the off-duty officer, and the informant's[2] call to the call center.  Similarly to *Brander*, Deputy Hsu received information from dispatch about the anonymous caller reporting increased activity at the Moccasin Trail address.  Just as in *Brander*, the informant did not provide a name or personal information, and it is unknown if the informant stated he or she personally observed this activity.  But this information was then corroborated by a reliable third party, an off-duty officer, who saw Brueggeman leave the Moccasin Trail residence in a vehicle with an expired license plate.  *See McMaster*, ¶ 16 (citation omitted) ("Montana law allows an arresting officer to rely on information from another officer to establish particularized suspicion.").

¶39    This information was additionally corroborated by Deputy Hsu during the stop.  Initially, Brueggeman did not admit she was present at the Moccasin Trail address.  However, after Deputy Hsu verified the registration of the car, the very first question he asked confirmed Brueggeman's presence at the Moccasin Trail home.  Additionally, Brueggeman described the increased activity at the address, and stated she had personal knowledge of the residence's reputation (from the residents themselves) for drug activity.  These admissions corroborated the informant's and the off-duty officer's information and provided particularized suspicion to further expand the scope of the stop into Brueggeman's activities on Moccasin Trail.  "The officer may also attempt to verify

---

[2] It is unclear whether this witness was disclosed or remained an anonymous citizen informant.  For purposes of our analysis, we assume the informant was anonymous because at the time of the stop, Deputy Hsu did not state he knew the informant's identity.

information provided by the subject, and ask for other related information, as long as the additional inquiry is both reasonably related in scope to the particularized suspicion and purpose that justified the stop and does not unreasonably prolong its duration under the totality of the circumstances at issue." *State v. Noli*, 2023 MT 84, ¶ 34, 412 Mont. 170, 529 P.3d 813. Based on the phone calls, Deputy Hsu already had particularized suspicion to ask Brueggeman about her travels related to the residence. Additionally, the Deputy's inquiry did not diverge away from Brueggeman's alleged presence at the residence. His questions remained relevant to the investigation.

**Probable Cause to Seize the Vehicle**

¶40 The standard for a valid seizure, however, is different. This Court has recognized an automobile seizure pending a search warrant is constitutionally permissible "where there is probable cause to believe that such automobile's contents offend against the law." *State v. Pierce*, 2005 MT 182, ¶ 16, 328 Mont. 33, 116 P.3d 817 (quoting *State v. Broell*, 249 Mont. 117, 122, 814 P.2d 44, 47 (1991)) (internal quotations omitted). Probable cause exists "if the facts and circumstances within the officer's personal knowledge . . . are sufficient to warrant a reasonable person to believe" the target of the seizure is committing or has committed an offense. *State v. Stoumbaugh*, 2007 MT 105, ¶ 34, 337 Mont. 147, 157 P.3d 1137 (quoting *State v. Saxton*, 2003 MT 105, ¶ 26, 315 Mont. 315, 68 P.3d 721). "Probable cause is evaluated in light of an officer's knowledge and all relevant circumstances" at the time of the seizure. *Stoumbaugh*, ¶ 34 (citing *State v. Van Dort*, 2003 MT 104, ¶ 19, 315 Mont. 303, 68 P.3d 728). "Probable cause may be apparent from the outset of the officer's observation of and interaction with the [suspect] or it may ripen

from sufficient particularized suspicion." *Indreland v. Mont. Dep't of Just., Motor Vehicle Div.*, 2019 MT 141, ¶ 18, 396 Mont. 163, 451 P.3d 51.

¶41 Here, Deputy Hsu extended the traffic stop due to particularized suspicion of drug activity, but this suspicion was dispelled by the end of the questioning. His suspicion never ripened into probable cause to seize the vehicle.[3]

¶42 The District Court concluded there was probable cause to seize the vehicle and all its contents because:

> (1) the two separate calls Deputy Hsu received prior to the stop; (2) the Defendant's own statements that were consistent with the information provided in the calls; and (3) Deputy Hsu's personal knowledge of the ongoing investigation of the Moccasin Trail address and his training and experience regarding drug distribution in general.

The State additionally argues there was probable cause for a seizure of the vehicle because: (1) Deputy Hsu's personal knowledge "firmly established the associations between the Moccasin Trail residence and recent illegal drug activity"; (2) Deputy Hsu knew multiple vehicles had visited the residence that day; (3) the Deputy's training and experience indicated this as a "possible distribution event"; (4) Deputy Hsu knew Brueggeman recently left the Moccasin Trail residence; (5) Brueggeman initially denied knowing the address or street name of her friend's residence; (6) Deputy Hsu personally recognized

---

[3] From our review of the record, it appears Deputy Hsu never completed verifying the pickup had insurance coverage. Neither party has explained why Brueggeman was certain she should be allowed to continue driving another person's vehicle without proof of valid registration or valid insurance, independent of the drug investigation. The parties have not raised the issue, so we do not rule on it. But Justice Bidegaray correctly explains in her concurrence the distinction between a vehicle impoundment for safety or compliance issues, versus a seizure for evidentiary purposes. Concurrence, ¶¶ 63–65.

Brueggeman based on her prior illegal drug history; and (7) Brueggeman "consistently challenged [the Deputy's] authority and provided inexplicably evasive responses."

¶43 Additionally, the District Court found "it entirely reasonable that with each antagonistic and nonresponsive response from the Defendant, Deputy Hsu was justified in continuing his investigation." Brueggeman challenges the District Court's characterization of her as "antagonistic." The District Court held the seizure of the vehicle constituted seizure of all its contents, including the purse, even though it was not seized until minutes later. We therefore focus our inquiry on the evidence leading up to the vehicle seizure, not the evidence obtained in between seizing the vehicle and the purse.

¶44 When examining these justifications in detail, they amount to validly permitting the Deputy to question Brueggeman about possible drug activity, as we have already held. But they do not, even cumulatively, produce sufficient evidence for a reasonable person to believe Brueggeman was engaged in illegal drug activity, or the vehicle contained contraband of illegal activity. Indeed, Brueggeman's answers dispelled suspicions and actually provided helpful information for the Deputy's investigation of other people, had he been willing to take it.

¶45 Regarding the State's first five arguments, Brueggeman confirmed her location at the residence in question (once she was informed of the address), and she corroborated that multiple vehicles had arrived when she was there and as she was leaving. She even volunteered she heard stories about illegal activity in the house, confirming the Deputy's prior experience with the residence. Brueggeman informed the Deputies she had her own lawful reason and purpose at the residence's downstairs apartment: cleaning it for a friend.

20

On that note, Brueggeman had a back seat full of cleaning supplies, consistent with her story of cleaning the old man's house. The State's argument, that Brueggeman denied knowing the address of the residence, is not a smoking gun. She plausibly stated she had visited it multiple times, but did not know the address. But when asked about the street name and description, she readily agreed and confirmed the location. Had Brueggeman denied visiting or knowing of the residence on Moccasin Trail, the above information would have justifiably heightened the Deputy's suspicions based on Trooper Barbera's identification of Brueggeman leaving the residence in the very vehicle Deputy Hsu had stopped. But Brueggeman not only confirmed her presence at the residence once she was informed of its address, she also provided an innocent explanation of her actions, which the Deputy was unable to discount or disprove.

¶46 Both the State and the District Court comment on Brueggeman's evasive, nonresponsive, or antagonistic demeanor toward Deputy Hsu. The video shows Brueggeman was not antagonistic until the Deputy announced he was seizing the vehicle and its contents. Up until that point, she was guardedly cooperative, albeit skeptical of the validity of the traffic stop and confident in asserting her civil rights.

¶47 The District Court was clearly erroneous when it concluded, "Throughout the interaction and from the very second Deputy Hsu made contact with the Defendant, she presented as hostile and uncooperative." Until the seizure, we conclude her behavior was not hostile or uncooperative. Upon our independent record review,[4] we are firmly

---

[4] "A trial court acting as a finder of fact is in the best position to observe the witnesses, including their demeanor and credibility." *In re Marriage of Bliss*, 2016 MT 51, ¶ 17, 382 Mont. 370,

convinced the court was mistaken when it concluded Bruggeman was "hostile and uncooperative" prior to the seizure of the vehicle. *See Rymal*, ¶ 9.

¶48     In *State v. Harning*, we addressed a case where an officer claimed particularized suspicion in part because the defendant provided hesitant answers and refused to roll down his window more than a few inches. 2022 MT 61, ¶ 24, 408 Mont. 140, 507 P.3d 145. We concluded, because nervous behavior during an investigatory stop is not uncommon, it does not establish particularized suspicion to extend a traffic stop into a drug investigation. *Harning*, ¶ 24. Similarly here, Brueggeman asserted her rights, questioned the Deputy's information, and declined his repeated requests to search the vehicle or various items in the vehicle. A "consensual search" is just that, and a refusal to freely give consent is not a hostile act. Brueggeman exhibited irritation, but not hostility or nervousness.

¶49     Additionally, Deputy Hsu claimed he was suspicious of Brueggeman's description of the house because he had been inside it, and "it's one house that's connected by a stairwell inside. And one of the guys that lives downstairs is dating the gal that lives upstairs. I mean, it's very much one place." But he failed—both at the roadside and in the hearing—to actually impeach Bruggeman's description of the house layout, residents, or activity. The Deputy's testimony on the house's layout supplied inadequate foundation. His statement, "I've been in that house before," does not establish *when* he had been in the

---

367 P.3d 395 (citation omitted). But when a district court is making its pretrial assessment based upon a video in the record, we are in equivalent position to evaluate the video. Still, we remain cognizant of the fact video recordings are not a perfect substitute over being on the ground during a seizure and could distort things such as tone of voice. We also recognize the District Court's uniquely best position to balance the video evidence with Deputy Hsu's testimony and still review the court's findings for clear error.

house, which is necessary to show Brueggeman was lying about the *current* layout of the building. The court was clearly erroneous when it found Brueggeman lied about the layout of the house, because this finding is not supported by substantial evidence. *See Rymal*, ¶ 9. The record still does not show whether Brueggeman's or the Deputy's version was more likely correct.

¶50 Additionally, the Deputy based probable cause on Brueggeman's possessive behavior toward her purse and the discovery of alcohol cotton swabs and a butane torch in the pickup. Deputy Hsu argued all of these could indicate drug use. However, these items were discovered only *after* the vehicle (and impliedly the purse) seizure occurred. Thus, these facts cannot be used to justify the probable cause for a seizure before these indications were known to the Deputy. Particularized suspicion "must be supported by specific articulable information, considering the 'quantity, substance, quality, and degree of reliability of information known to the officer *at the time*.'" *Hunt*, ¶ 25 (quoting *Loberg*, ¶ 10) (emphasis added). The District Court's finding of facts relying upon those indications for probable cause were clearly erroneous because they should have been excluded from the assessment of the Deputy's right to seize the vehicle.

¶51 Deputy Hsu also considered Brueggeman's prior drug related offense to support his probable cause because it showed she had a history of drug activity. However, the so-called offense was a charge from ten years prior, and it was not a conviction; it had been dismissed. We have previously held:

> knowledge of a person's prior criminal involvement is alone insufficient to give rise to the requisite reasonable suspicion because . . . [i]f the law were otherwise, any person with any sort of criminal record—or even worse, a

23

person with arrests but no convictions—could be subjected to a Terry-type investigative stop by a law enforcement officer at any time without the need for any other justification at all. Any such rule would clearly run counter to the requirement of a *reasonable* suspicion, and of the need that such stops be justified in light of a balancing of the competing interests at stake.

*State v. Panasuk*, 2024 MT 113, ¶ 22, 416 Mont. 430, 549 P.3d 432 (quoting *United States v. Sandoval*, 29 F.3d 537, 543 (10th Cir. 1994)) (emphasis in original).

¶52    In *State v. Valley*, the police relied on anonymous tips that were between eleven months to seven years old. 252 Mont. 489, 493, 830 P.2d 1255, 1257 (1992). We excised this information as it lacked any "indication that contraband or evidence would presently be at the place to be searched." *Valley*, 252 Mont. at 493, 830 P.2d at 1257. Similarly, in *State v. Tackitt*, we also disregarded ten-year-old information which was not corroborated by recent activity. 2003 MT 81, ¶ 39, 315 Mont. 59, 67 P.3d 295.

¶53    In contrast, in *McMaster*, the officer had current intelligence from another law enforcement agency about McMaster's financing of a drug transaction, an arrestee had informed the officer McMaster was currently dealing drugs, and the officer had independently obtained evidence linking McMaster to the drug trade in the prior month while executing a search warrant on another case. *McMaster*, ¶ 21. Deputy Hsu's reliance on a decade-old, dismissed charge was insufficient to support a presumption of current drug activity. If the Deputy had more current information, he never provided it.

¶54    Deputy Hsu also justified his probable cause on Brueggeman providing an inconsistent answer because she initially omitted telling him she stopped at a motorcycle shop in Hamilton to pick up a spare part. In *Loberg*, we addressed a case where an officer asked the defendant where he was coming from, and the defendant stated he was returning

24

from his ex-wife's house, omitting his stop at a casino. *Loberg*, ¶ 20. We concluded "[i]t is reasonable for a person to say they are coming from somewhere else when they only briefly stopped at a gas station or a casino." *Loberg*, ¶ 20. Similarly here, when asked where she was coming from, it is not unreasonable for Brueggeman to state she was coming from her friend's house and omit stopping at the motorcycle store.

¶55 In the same vein, Brueggeman's presence at Golie's motorcycle shop, allegedly a site of known drug activity, did not create probable cause. The officers had only speculation Golie was somehow involved—via Brueggeman—in the drug activity at the Moccasin Trail residence. To counter this speculation, Brueggeman had in her possession a brand-new mechanical part she had just purchased at Golie's shop, and an insistence she needed to bring that part home so her son could sell his motorcycle that evening. She described this part to the Sergeant, who seemed knowledgeable about motorcycles, and who retrieved it from the vehicle. Ultimately, even if Brueggeman had gone to Golie's shop to drop off drugs and the motorcycle part was merely a cover story, the officers had no evidence whatsoever to support such a theory.

¶56 When determining probable cause, we look at the totality of the circumstances. Individual activities which might not be out of the ordinary, when combined, might indicate that illegal activity is occurring. *State v. Zeimer*, 2022 MT 96, ¶ 32, 408 Mont. 433, 510 P.3d 100. When looking at the totality of circumstances, the Deputy lacked probable cause when, at 19:20 (7:20 PM), he told Brueggeman her car was being seized.

¶57 We do not need to discuss the subsequent seizure of the purse or the court's granting of the search warrant based upon inaccurate information. As there was no probable cause

25

to seize the vehicle, we do not address the resulting seizure of the purse. The motion to suppress should have been granted.

## CONCLUSION

¶58 We therefore reverse the District Court's denial of Brueggeman's motion to suppress.


/S/ CORY J. SWANSON

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ KATHERINE M BIDEGARAY


Justice Katherine Bidegaray, concurring.

¶59 I concur in the Court's opinion reversing the denial of Carter-Brueggeman's motion to suppress. I agree that the record does not establish probable cause to seize the vehicle at the moment the seizure occurred. I write separately to underscore two points that I believe warrant explicit treatment: (1) the reliability assessment of the citizen informant's report under our *Pratt* framework; and (2) the distinction between a constitutionally permissible seizure for officer safety or roadway safety and an evidentiary seizure under Article II, Section 11, of the Montana Constitution.

### 1. Informant Reliability Under *Pratt*

¶60 When an officer relies on a third party's report to form particularized suspicion or probable cause, we assess the report's reliability using the factors from *State v. Pratt*,

26

286 Mont. 156, 164-65, 951 P.2d 37, 42-43 (1997): (1) whether the informant identified himself to the authorities; (2) whether the report was based on personal observation; and (3) whether the officer corroborated the informant's information.

¶61 Here, the record does not establish that the caller reporting unusual activity at the Moccasin Trail residence provided a name or other identifying information. While the caller appeared to speak from personal observation, there is no contemporaneous documentation of the caller's vantage point, timing, or means of knowing who was present. No detail connected the tip to contraband, and thus the tip carries minimal weight under *Pratt*. At most, the tip was corroborated by Trooper Barbera's observation of a blue Toyota Tundra leaving the residence, but corroboration of such innocent detail cannot supply probable cause absent articulable facts of criminal activity.

¶62 The off-duty trooper's observation of Carter-Brueggeman leaving the reported address in a vehicle with expired registration partially corroborated the caller's report. That corroboration elevated the reliability of the location and vehicle description for purposes of particularized suspicion, but it did not supply evidence that the vehicle itself contained contraband. As our precedent makes clear, corroboration of innocent details cannot transform a tip of unknown reliability into probable cause absent specific, articulable facts linking the suspect to criminal activity.

### 2. Distinguishing Officer-Safety Seizures from Evidentiary Seizures

¶63 Law enforcement may act to secure a vehicle temporarily for officer safety, public safety, or roadway safety when circumstances make it unsafe or unlawful for the vehicle to remain in use—for example, if a driver lacks proof of current registration or

27

insurance. Montana statutes expressly authorize impoundment in such circumstances. *See* § 61-3-301, MCA (registration); § 61-6-304, MCA (insurance). Such safety-based impoundments are administrative in character and do not require probable cause of contraband.

¶64 The seizure here was expressly premised on suspected drug activity, not on a need to remove the vehicle from the road due to expired registration or possible lack of insurance. The officer's stated justification and subsequent actions—including retaining the purse as evidence—demonstrate that this was an evidentiary seizure requiring probable cause. As the Court explains, the facts the officer knew at that moment did not meet that threshold.

¶65 I emphasize this distinction because conflating a safety-based impoundment with an evidentiary seizure risks eroding the probable-cause standard. Here, because Deputy Hsu acted on an evidentiary rationale—suspected drug activity—the heightened constitutional requirement of probable cause applied, and it was not satisfied.

### 3. Conclusion

¶66 For these reasons, I join the Court's holding that the State failed to establish probable cause for the seizure. Clarifying the limited weight of the anonymous tip under *Pratt* and distinguishing between statutory, safety-based impoundments and evidentiary seizures underscores why the seizure here was unlawful and ensures our analysis remains faithful to the protections guaranteed by the Fourth Amendment and Article II, Section 11, of the Montana Constitution.

/S/ KATHERINE M BIDEGARAY


Justice Laurie McKinnon joins in the concurring Opinion of Justice Katherine Bidegaray.


/S/ LAURIE McKINNON